## No. 9443.

## CITY AND COUNTY OF DENVER v. MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY ET AL.

1. CONSTITUTION—*Construction Of.* Narrow and technical reasoning is out of place in the interpretation of a constitution. This rule is not abrogated but rather enlarged by the amendment to Article XX (Laws 1913, 619).

Each word in the constitution must be given its fair import and the courts must not construe away what the sovereign has embodied in the fundamental law.

2. ARTICLE XX—*Effect Of.* By article XX the sovereign power created a new agency, vesting it with some of the powers previously reposed in the General Assembly. The two agencies are creatures of the same sovereign; neither has supreme power. Each may exercise the power conferred upon it, but only in the manner and to the extent prescribed.

3. REGULATION OF PUBLIC SERVICE—*Natures of the Power.* Whether conferred by the provisions of the constitution or by legislation the power to regulate the public service is of two main classes; one governmental, legislative or public; the other proprietary, commercial, and in this sense *quasi* private.

The granting by the city to a corporation, of the rights to use the streets of the city, like a similar grant by the General Assembly to use the highways of the state, is the exertion of the proprietary power of the sovereign.

4. *Exercise of the Police Power.* No exercise of the police power can exhaust it, and no vested right is acquired therein. The inherent and inalienable power to regulate the business of every public utility, operating within the state, and to prescribe the rates to be charged for the service, resides in the sovereign, that is the people. But this power may be exercised by any agency which the constitution creates for the purpose.

5. *Constitutional Provisions Conferring the Power in Question,* need not be clothed in express words; it is sufficient if it necessarily arises or is fairly implied from, or incidental to, the powers expressly granted, or is essential to the declared objects for which the agency was created.

6. *Rate Prescribed by Municipal Corporations,* must be reasonable.

7. *Public Utilities Commission—Jurisdiction Of.* The commission has no jurisdiction to regulate the business of a corporation operating a public telephone in Denver.

*Writ of Review to Public Utilities Commission.*

Hon. JAMES A. MARSH, Mr. THOMAS H. GIBSON, Mr. NORTON MONTGOMERY, for City and County of Denver.

Mr. L. J. WILLIAMS, Mr. A. P. ANDERSON, Mr. GRANT E. HALDERMAN, for Public Utilities Commission.

Mr. MILTON SMITH, Mr. CHARLES R. BROCK, Mr. W. H. FERGUSON, Mr. ELMER L. BROCK, Mr. FLOYD F. WALPOLE,

for The Mountain States Telephone and Telegraph Company.

Mr. CHARLES M. ROSE, Mr. M. H. AYLESWORTH, Messrs. LEE & SHAW, Messrs. GERALD HUGHES, CLAYTON C. DORSEY, RUSH L. HOLLAND, JOHN A. RUSH, E. W. HURLBUT and ALBERT L. VOGL, Amici Curiae.

Mr. Justice White delivered the opinion of the court:

THE sole question involved herein is whether the Public Utilities Commission has jurisdiction to regulate the rates to be charged by The Mountain States Telephone and Telegraph Company in its local service within the City and County of Denver. The case does not involve the constitutionality of the Public Utilities Act, but only whether the act is applicable within the aforesaid municipality. The City and County of Denver came into existence by virtue of Article XX of the Colorado Constitution, and that article, as amended at the general election of 1912, measures its powers.

Prior to the aforesaid amendment we held that the stinted grant of power in section 1 of Article XX was not the only power invested in the municipality, as the purpose of the article was to enlarge the powers beyond those usually granted by the Legislature, and to bestow upon the people of the municipality "every power possessed by the Legislature in the making of a charter for Denver." *Denver v. Hallett*, 34 Colo. 393, 397, 83 Pac. 1066. And, subsequently, in *Londoner v. Denver*, 52 Colo. 15, 22, 23, 119 Pac. 156, referring to the *Denver-Hallett* case, we further declared: "By that decision we determined that the powers enumerated in section 1 of Article XX of the Constitution do not constitute a limitation of the powers conferred upon the municipality; and, moreover, the article conferred upon such people (of the City and County of Denver) every power possessed by the Legislature in making a charter for Denver."

In fact, those decisions and other declarations of this court of like character made it clear that the power invested in the City and County of Denver by Article XX, prior to its amendment, could be determined by ascertaining whether the Legislature in the absence of Article XX could have conferred upon the municipality the power in question. *People v. Cassidy,* 50 Colo. 503, 117 Pac. 357; *Speer v. The People,* 52 Colo. 325, 122 Pac. 768; *People v. Prevost,* 55 Colo. 199, 134 Pac. 129; *Moore v. Perkins,* 56 Colo. 17, 137 Pac. 55, Ann. Cas. 1914-D 1154.

Under the rule of constitutional interpretation those deductions were inevitable. "Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government. A constitution is to be construed as a frame of government or fundamental law," and not as a mere statute. Cooley on Const. Limitations, 7th Ed., p. 93.

This judicial rule, which we applied in the interpretation of Article XX, was in no sense abrogated by the amendment thereto, but rather enlarged and confirmed thereby. The amendment confirms in the people of the municipality the power set out in sections 1, 4 and 5 of the article, and invests them with "all other powers necessary, requisite or proper for the government and administration of its local and municipal matters," including the power "to amend, add to, or replace the charter of said city or town, which shall be its organic law and extend to all its local and municipal matters." It then declares that "said charter and the ordinances made pursuant thereto in all such matters shall supersede within the territorial limits, and other jurisdiction of said city or town, any law of the state in conflict therewith." It then provides: "The statutes of the State of Colorado, so far as applicable, shall continue to apply to such cities or towns, except insofar as superseded by the charters of said cities or towns or by ordi-

nances passed pursuant to such charters." And further declares that "All provisions of the charters of the City and County of Denver * * * which provisions are not in conflict with this article, and all elections and electoral votes heretofore had under and pursuant thereto, are hereby ratified, affirmed and validated as of their date." At and prior to the time of the adoption of this amendment the charter of the City and County of Denver contained the following: "Section 280. All power to regulate the charges for service by public utility corporations is hereby reserved to the people, to be exercised by them in the manner herein provided for initiating an ordinance."

Prior to the adoption of Article XX, all ordinary legislative power of the people was vested in the General Assembly. The General Assembly, however, was only a creature of the Constitution and, therefore, an agent of all the people. By that article the sovereign created another agency, to-wit, the City and County of Denver, and vested in .it some of the power previously residing in the first agency. It invested the second agency with the *exclusive* power "in the making, altering, revising or amending" charters for the City and County of Denver, and by the constitutional amendment in 1912 invested it with "all other power necessary, requisite or proper for the government and administration of its local and municipal matters." These two agencies are creatures of the same sovereign people, and the source of their authority is the same. Neither agency has either supreme or inherent power, for that power resides only in all the people, upon whose will all government is founded. Bill of Rights, secs. 1, 2, article II. Each agency may exercise the power which the sovereign has invested in it, but only to the extent and in the manner and form prescribed. We must not be confused by the use of the word "state" when the mere machinery of government is meant. The sovereign in Colorado—the people thereof—has surrendered nothing, bartered nothing away, or in any sense abdicated. The powers with which munici-

pal corporations are endowed, whether created directly by
the sovereign through constitutional grant or by the General Assembly through legislative enactment, are divided
into two main classes, so that municipal corporations act in
two distinct capacities. One is governmental, legislative
or public; the other is proprietary, commercial and, in this
sense, *quasi* private. Pond on Public Utilities, Sec. 2. This
is equally true, however, of the General Assembly. The
granting of the right by the city to a public service corporation to use the streets of the municipality or the granting
by the General Assembly to such a corporation the right
to use the highways of the state, is the exertion of the proprietary power of the sovereign. The regulation, however,
of the business of such public service corporation, whether
performed by the Legislature or the municipality, is an
exertion of the governmental power of the sovereign. Indeed, the governmental regulation of a business, whatever
its character, is always the exertion of the police power,
and, therefore, law-making. In the exercise of this power
no agent can exhaust it and no vested right may he acquired
therein. Such governmental power is inherent in the sovereign and may be exerted, withdrawn and re-exerted according to the judgment, whim or caprice of the sovereign. The
ever-existing, inherent and inalienable power resides in the
sovereign, to-wit, the whole people of Colorado, to regulate
the business of every public utility operating within the
limitations of the state and to make and to remake, as
changed conditions may require, a maximum schedule of
rates to be charged for the service rendered by such utility.
It does not follow, however, that this function can only be
discharged through an agency created by the Legislature.
It may be performed through other agencies which the
sovereign has also created, and invested with power in the
premises. The police power "is not above the constitution,
but is bounded by its provisions." *People v. Gillson*, 17 N.
E. 343, 346, 109 N. Y. 389, 14 Am. St. 465. It may be

exercised by any agency which the constitution creates for that purpose.

Moreover, the regulation of rates to be charged by public utilities has long been recognized as a proper municipal function.    McQuillin on Munic. Corp., Sec. 34; Dillon on Munic. Corp., 5th ed., Sec. 1325; Wyman on Public Service Corp., Sec. 1410.

In the case of *Home Telephone Co. v. Los Angeles*, 155 Fed. 554, 211 U. S. 265, 271, 53 L. Ed. 176, 20 Sup. Ct. 50, it is said: "The power to fix, subject to constitutional limits, the charges of such a business as the furnishing to the public of telephone service, is among the powers of government, is legislative in its character, continuing in its nature, and capable of being vested in a municipal corporation."    These authorities demonstrate conclusively that prior to the adoption of Article XX, the General Assembly of the State of Colorado could have invested the City and County of Denver with the governmental power to regulate the rates to be charged by public utilities for local service within its territorial limits.    It, therefore, has such power under the repeated decisions of this court hereinbefore cited.

But apart from this, Article XX invests the City and County of Denver with exclusive power to make, alter, revise or amend its charter, and the amendment invests it "with all other power necessary, requisite or proper for the government and administration of its local and municipal matters."    Could language be stronger?    Clearly this is an express grant of full and complete power of local self-government.    It necessarily includes the power, whether of eminent domain, taxation, or police, necessary to modern, progressive and efficient local self-government.    Indeed, the growth of cities has been the productive force broadening and extending the police power.    It is indispensable to self-government in all our municipalities.    In fact, it is the very soul and spirit thereof.    It is inconceivable that the health, education and welfare of a great city could be

properly safe-guarded, extended and protected without telephones, street railroads and other like public utilities. Cities have produced new social, industrial, commercial, safety and health conditions, and the problems of government resulting from them. Clearly then the regulation of the instrumentalities essential to deal with such problems is peculiar to such communities and, therefore, a local or municipal matter. Indeed, those residing outside the city limits are only incidentally, if at all, interested in, or concerned with, the rate a public service corporation receives for its service within such municipality. If the rate therein be fixed by the city, it must be a reasonable rate. This is equally true if the rate be imposed by a central body. We are unable to perceive the force of the point that respondents seek to make that a distinction exists between utilities which operate only within a charter city and those which operate within and without. The only distinction apparent is that the former only performs one duty—it serves a local community; the latter serves the same community and renders an additional service. In either event, the service rendered among the inhabitants of the city is a local matter. This is clearly pointed out by the Federal courts in *Home Telephone and Telegraph Co. v. The City of Los Angeles, supra,* in the following language: "Nor is there anything contrary to these views in * * * the Constitution for the simple reason that the regulation of the charges of a public service corporation within the limits of a city is a municipal affair; that the streets of a city are public highways in which the people of the whole state are interested; that the opening and widening of the streets are municipal affairs. The regulation of telephone rates in the city would seem to be more clearly a matter of local concern than the control of the streets."

*Maux v. The People,* 52 Colo. 562, 123 Pac. 101, does not conflict with the doctrine just quoted from the California case. On the contrary, it is in perfect harmony therewith. In the Mauff case we held that elections are public in char-

acter, of governmental and state-wide importance rather than of local interest, and, therefore, must be under the control and regulation of the Constitution and general laws, and that the City and County of Denver, under article XX, prior to the amendment in 1912, had no authority to legislate upon or otherwise control its municipal elections. Such holding was inevitable because of the provisions of Sec. 11, Art. 7, of the Constitution, which required the General Assembly to pass laws to secure the purity of elections, and as this constitutional duty was imposed upon the General Assembly, and not upon municipalities, and the right to vote came from the sovereign and can only be fully protected, and enforced by the same authority, elections were not purely local or municipal matters.

The contention of respondents that the police power to regulate the rates to be charged by public utilities may not be invested in a municipality, unless the intention so to do is contained in express language, is untenable. There is a marked distinction between the investment or delegation of such power, and the delegation or investment of the authority to surrender by contract such power of government. In the latter specific authority for that purpose is required. The authorities cited in support of the contention clearly disclose the distinction, which is fundamental. The police power is lodged in the people of the state. It is one of the highest attributes of sovereignty. The exercise of this power is essential to the good order and general welfare of organized society. It is continuing in its nature, and if it can be bargained away at all, it can only be by words of positive grant, or something which is in law equivalent. The investment or delegation to a subordinate agency to exercise the police power differs materially from the investment or delegation of authority to suspend or bargain that power away. The case of *Denver, etc., Ry. Co. v. Englewood,* 62 Colo. 229, 161 Pac. 151, involved an attempted exercise of the latter power. In the one instance the power remains to be exercised either by the agency in whom

it is invested, or recalled and exercised by the sovereign. In the other instance the power is gone, and may not be reclaimed during the life of the contract. The police power to control public utilities need not be granted or invested in a subordinate agency in express words. It is sufficient if it necessarily arises from, or is fairly implied in, or is incidental to the powers expressly granted, or is essential to the declared objects and purposes for which the agency was created. *Denver v. Hallett, supra.*

However, were the law otherwise, the Constitution has expressly authorized the people of the municipality to regulate the charges for service by public utilities operating therein. Prior to the adoption in 1912 of the amendment to Article XX of the Constitution, the City and County of Denver had attempted, at least, to exercise the power of regulating public utilities. Section 280, *supra,* of its charter had been enacted and such charter with that section therein was on file in the office of the Secretary of State. The constitutional amendment expressly approved, "ratified, affirmed and validated" such charter and each and every provision thereof "not in conflict with" Article XX. It further declared that such charter and the ordinances made pursuant thereto in local and municipal matters shall supersede within the territorial limits of the municipality, any law of the state in conflict therewith. This provision of the charter was in substantial effect written into the Constitution. It was adopted by reference, for there is nothing in the charter provision in question which is in any wise in conflict with the article. We can not assume that the constitutional ratification, affirmance and validation of the various charter provisions had reference only to the municipal election at which they were adopted. The language of the Constitution is otherwise. It not only ratifies such elections, but expressly designates the charter provisions themselves and ratifies and validates them. Each word embodied in the Constitution must be given its meaning and courts should not construe away that which the sovereign

has embodied in its fundamental law. With the wisdom of the measure we have no concern. That question belongs solely to the people in their sovereign capacity.

The constitutional article in question is different from the so-called "Home Rule" provisions in the constitutions of other states. Therefore, authorities from other states aid but little in ascertaining the intent and purpose of the article in question. It has no counterpart in the constitutions of other states. In other states the power to make a charter for "Home Rule" cities is subject to the constitution and laws of the state. With us the only constitutional provision that may affect the charter is Article XX, and legislative acts in conflict with the charter provisions enacted in pursuance of Article XX have no force and effect within the municipality.

We are clearly of the opinion that The Public Utilities Commission had no jurisdiction in the premises, and its order, therefore, is reversed and held for naught.

Judgment reversed.

Decision *en banc*.

Teller, Burke and Denison, JJ., specially concurring.

Mr. Justice Garrigues, Mr. Justice Scott and Mr. Justice Bailey dissenting.

Mr. Justice Teller, concurring: .

For the respondent it is argued that the rate-making power can be conferred only by express grant, and that said article contains no such grant; that, moreover, such powers as are therein granted relate only to local and municipal matters; and that the regulation of rates is not a local matter.

It is not to be denied that cases may be found in which it is held that the grant must be express; but those cases involve the question of the power of a municipality to contract away some portion of the police power.

Cases from three states are cited in which constitutional grants are under consideration, but, inasmuch as the constitutional provisions there under consideration are quite

different from Article XX, those cases are not in point.

It is also true that there are in some cases *dicta* to the effect that the regulation of telephone rates is not a local matter, but nowhere have we been given a valid reason for that opinion.

If the constitutional provision under consideration vests this power in the petitioner, it is not material whether or not the act of 1913, which created the commission and prescribed its duties, is in conflict with said article; but, if the statute recognizes that the jurisdiction of the commission is limited by said article, it makes the conclusion we have reached the more satisfactory.

Section 15 of the law, after requiring the filing of schedules with the commission, provides that:

"The rates, tolls, rentals and charges shown on such schedules, when filed by a public utility as to which the commission acquires the power by this act to fix any rates, tolls, rentals or charges, shall not within any portion of the territory as to which the commission acquires as to such public utility such power, exceed the rates, tolls, rentals or charges in effect on the tenth day of October, 1912."

This clearly indicates that there was *territory* within the state in which the commission would have no jurisdiction. And the only territory to which this language can conceivably apply is that of the home-rule cities.

It has been suggested that the limitation was to prevent interference with interstate commerce, but the control of that is not confined to any particular portion of the state.

The exception refers to *territory*, and not to jurisdiction or power. That it was not necessary to exclude interstate commerce from this provision is conclusively shown by the fact that Section 68 of the act provides that no part of the act, "except when specifically so stated," shall apply to foreign or interstate commerce. In other words, exclusion of interstate commerce is the rule, and inclusion only by special mention.

That the Legislature may delegate to a city the power to

regulate telephone rates is distinctly held in *Home Telephone Co. v. Los Angeles,* 211 U. S. 265, 56 L. Ed. 176, 29 Sup. Ct. 50.

That being so, it is not to be doubted that such power may be conferred by the act of the people through the fundamental law.

I am of the opinion that Article XX, as originally adopted, gave to the petitioner the right now in question, as a *local* matter.

In support of the contrary position, it is said that local telephone communication is carried on over the same lines as are used in state-wide business; that the separation of the property for taxation is exceedingly difficult; and that the local rates affect the ability of the company to carry on its business outside of the city. Conceding all of this, it does not make a case against the right of local regulation.

In *Simpson v. Shepard,* 230 U. S. 352, the court had under consideration the right of the Minnesota Railroad Commission to prescribe rates on business wholly within the state, but carried on over lines engaged in interstate commerce. It was there contended, among other things, that the local or intrastate rates were a burden on interstate commerce; that the parts of the carriers' business were so intermingled that they could not be separately regarded, etc. The court, however, upheld the right of the state to regulate rates on intrastate business.

If the regulation of rates on intrastate commerce, carried on over interstate railroads, is a local, as distinguished from a national matter, it is difficult to see why telephone rates in Denver are not a local matter, though the same lines are used for both local and general purposes.

If it were necessary, therefore, the right claimed for the city might find a basis in Article XX, as it was before amendment.

But, as I shall hereafter show, it is not necessary thus to base it.

Although this court had, in *Denver v. Hallett,* 34 Colo.

393, 83 Pac. 1066, held that the grant of powers under said article was not limited to those therein enumerated, but was intended "to bestow upon the people of Denver every power possessed by the Legislature in the making of a charter for Denver," it seems to have been thought necessary by the people to make the fact certain, and so they included in the amendment the following provision:

"It is the intention of this article to grant and confirm to the people of all municipalities coming within its provisions the full right of self-government in both local and municipal matters and the enumeration herein of certain powers shall not be construed to deny to such cities and towns, and to the people thereof, any right or power essential or proper to the full exercise of such right."

It not being denied that the Legislature, before Article XX was adopted, could have granted to the city the power now in question, it follows from the quotation from the last case cited that Article XX granted that power.

In that case the right of the city to build an auditorium was held to exist because the court found, on a review of the authorities, that the Legislature might have authorized it; a direct application of the argument above made.

This cause may be determined by reference to Article XX, as amended in 1912; and by giving to the language therein used its plain meaning. No construction is required or permissible, for "it is not allowable to interpret what has no need of interpretation."

In *Mauff v. People*, 52 Colo. 562, 123 Pac. 101, it was held that the people of Denver in the conduct of a municipal election were subject to the general laws concerning elections; and it is common knowledge that the decision in that case was the moving cause of the framing and initiating of the amendment of 1912. That amendment, in terms, gave to the city the very power which this court had denied to it on the ground that it was not *local*—an assertion by the people of the right to confer upon a municipality a right which in common parlance is not local.

In *People v. Prevost*, 55 Colo. 199, it is said that, if the powers in the home-rule amendment were not local before the amendment, they are so now.

It is to be observed, too, that in the provision above quoted it is the announced intention to grant the "right of self-government in both local and municipal matters," showing that there might be local rights granted which were not municipal.

After enumerating certain powers granted, and following that with the provision above quoted, that the enumeration of powers should not be held to include all powers granted, a further provision was added, apparently to prevent a denial of the right to exercise such powers as the home-rule cities were by their charters exercising. The provision reads as follows:

"All provisions of the charters of the City and County of Denver, and the cities of Pueblo, Colorado Springs and Grand Junction, as heretofore certified to and filed with the Secretary of State, and of the charter of any other city heretofore approved by the majority of those voting thereon and certified to and filed with the Secretary of State, which provisions are not in conflict with this article, and all elections and electoral votes heretofore had under and pursuant thereto, are hereby ratified, affirmed and validated as of their date."

The charter of the City and County of Denver was on file in the office of the Secretary of State when the amendment was adopted, and it included the following provision:

"All power to regulate the charges for service by public utility corporations is hereby reserved to the people, to be exercised by them in the manner herein provided for initiating an ordinance."

The claim of the city is that the right to regulate rates being thus asserted in its charter, the right is effectually affirmed by the above quoted provision of the amendment of 1912.

This claim is met in the briefs for respondent by the

assertion that anything in the charter not expressly authorized by Article XX, before it was amended, would be in conflict with said article, and hence not ratified.

If that be true—that is, if nothing could be made valid by the amendment which was not expressly authorized by the original article—why say anything about validation and ratification? The things that were expressly authorized required no ratification, and the use of that word was without reason. Ratification implies that some act has been done without authority in the agent, which the principal is willing to adopt as his own. Likewise, "validate" involves the idea of making valid that which is for some reason not valid. Such provisions of the charters as were expressly authorized by Article XX were valid, and could not be "validated."

That there was no intent to limit the validation to acts authorized, either expressly or by implication, by the original article, is further shown by the fact that the sentence following that above discussed provides for the ratification of all elections theretofore had pursuant to said charter provisions.

By the provision above quoted anything in the filed charters, not in conflict with *this article,* is ratified.

The reference can only be to the article of which the amendment of 1912 forms a part. How can the words "this article" in the amendment itself refer to the original Article XX? The only article in force when a question of conflict might arise under this provision was Article XX, as amended.

No one has pointed out anything in Article XX with which this charter provision is in conflict.

The simple, narrow question is: What powers have been granted by Article XX, as it now is? Until some conflict between the charter provision above mentioned and Article XX—the only Article XX there is at this time—be pointed out, there is no possible escape from the conclusion that the people intended to and did ratify and validate said provi-

sion, and that in consequence thereof the city has the right to regulate telephone rates.

Burke, J., concurring specially:

I concur in the conclusion reached in the majority opinion. It is conceded in respondent's briefs that Article 20 of our Constitution, including amended Section 6, has conferred upon the City and County of Denver all powers which the Legislature could have conferred, i. e., power to legislate upon all subjects local and municipal; and if the power to fix telephone rates by compulsion be one of local and municipal concern, it has been granted to the municipality. The sole contention is that this is not a local or municipal matter.

The latest definite declaration of the law on this subject by the highest authority in the country, and which still stands unreversed and unmodified, is *Home Telephone and Telegraph Company v. City of Los Angeles*, decided by the Supreme Court of the United States November 30, 1908, 211 U. S. 265, 53 L. Ed. 176, 29 Sup. Ct. 50. Among other things, it is there said (page 271):

"The power to fix, subject to constitutional limits, the charges of such a business as the furnishing to the public of telephone service, is among the powers of government, is legislative in its character, continuing in its nature, and capable of being vested in a municipal corporation."

If it is "capable of being vested in a municipal corporation" it is only so because it deals with a matter of purely local and municipal concern.

Quoting further (page 273):

"It has been settled by this court that the state may authorize one of its municipal corporations to establish, by an inviolable contract, the rates to be charged by a public service corporation (or natural person) for a definite term, not grossly unreasonable in point of time, and that the effect of such a contract is to suspend, during the life of the contract, the governmental power of fixing and regulating rates."

This authority holds that this power to contract for a definite rate for a specified time is a greater power than the power to fix rates by compulsion. The reason is apparent. A rate fixed by ordinance or statute is not fixed for a definite time because it may be changed or altered at any time by repeal or amendment of the legislation. The same is true even of a constitutional provision. But a rate fixed by contract is definite and certain as to time and may extend far beyond any such temporary limits. The right to confer the greater power necessarily implies the right to confer the lesser.

As to the further declaration therein, that: "But for the very reason that such a contract (fixing rates for a definite term) has the effect of extinguishing *pro tanto* an undoubted power of government, both its existence and the authority to make it must clearly and unmistakably appear, and all doubts must be resolved in favor of the continuance of the power," it seems to me wholly inapplicable. Because here the authority, being derived from the Constitution, is unquestioned, and the *existence*, if the subject be one of local or municipal concern, is admitted.

Quoting again (page 279) :

"It is too late, however, after the many decisions of this court which have either decided or recognized that the governing body of a city may be authorized to exercise the rate-making function, to ask for a reconsideration of that proposition."

The court is here speaking of an authorization by legislative enactment. If the governing body of a city may so be authorized by the Legislature, it is only because the subject is one of local and municipal concern. And if the municipality may be so authorized by the Legislature it may, a fortiori, be so authorized by constitutional enactment.

The opinion in the Los Angeles case was by Mr. Justice Moody, without dissent. It supersedes all previous state and Federal decisions in conflict with it, and, in view of its

positive statement that it is now too late to *ask* for a reconsideration of the proposition, it can not be presumed that the highest court of the land will hereafter otherwise decide. It is absolutely binding upon this court.

I think it can not be denied that the question, upon reason, is a close one, nor that the great weight of authority, excusive of The Home Telephone case, is to the contrary. I, myself, during the consideration of the matter, have been of a different opinion, but am led to this conclusion by what I believe to be the overwhelming force of that decision.

In the instant case the opinion was by a closely divided court, four Justices concurring and three dissenting. It was handed down but a few minutes before a change occurred in the personnel of the court, two of the concurring Justices retiring and their places being taken by two newly elected. The opinion was written by one of the retiring Justices. A majority of the members of the court who had heard argument and considered the case were against the conclusion. The motion for a rehearing could not be passed upon by the Justices who had decided the cause. The question at issue was one of vast importance to the whole people of the state. Under such conditions I think a motion for rehearing should be granted and the question determined upon a careful review of the whole case upon its merits, and that such was the proper procedure irrespective of the final determination of the court.

Furthermore, if the power to fix rates by compulsion exists in the City of Denver, it is by reason of the provisions of Article 20 of the Constitution, including amended Section 6, ratifying the city's charter. If it depends upon the amendment, such power is granted only to those cities which had their charters on file with the Secretary of State January 22, 1913, when the amendment became effective. It would, therefore, take another constitutional amendment to confer this power upon other Home Rule cities. It is contended that the inevitable result must be that Home Rule cities will fix the lowest rates which the courts will permit

to stand as not confiscatory; that to balance this result the commission will fix, in all other cities and in the state at large, the highest rates which the courts will sanction as reasonable; that the citizens of the state at large will thus be obliged to bear so much of the burden of the support of such utilities as the favored cities will in this manner be able to transfer to them; because the courts can not correct the evil, being powerless to fix rates and having only jurisdiction to determine what rates are unreasonable and what are confiscatory; hence that Section 8 of Article 15 of the Constitution, providing that: "The police power of the state shall never be abridged or so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals or the general well-being of the state," will be violated. This question was not discussed in the original opinion and seems not to have been presented in the main case. It was a new question raised on the motion for a rehearing, which of itself justified the granting of that motion. On this subject I am of the opinion that, until it otherwise appears, the courts must assume that the cities concerned, as well as the commission, will do their duty, fixing rates that are fair and reasonable. If the people have granted this power to these Home Rule cities no presumption that it will be *improperly* exercised can be indulged to defeat *any* exercise thereof. It may be that the plan will not work out to the satisfaction of the people of the state. If so, it is within their province to amend or repeal it whenever they see fit. "On their own heads, in their own hands, the sin and the saving lies."

Denison, J.:

I concur in the conclusion of the majority of the court, as announced in the former opinion handed down in this case, for the following reasons:

Under the XXth amendment Denver could assume, by character, any power which, before the amendment, the legislature could grant. *Denver v. Hallett,* 34 Colo. 395, 397 *et seq.*

The legislature could grant the power to regulate telephone rates. *Home Tel. Co. v. Los Angeles,* 211 U. S. 271, 279.

Therefore Denver could assume, by charter, the power to regulate telephone rates.

By her charter of 1904, Sec. 280, she did assume that power:

("All power to regulate the charges for service by public utility corporations is hereby reserved to the people, to be exercised by them in the manner herein provided for initiating an ordinance.")
therefore she has it.

Furthermore, in 1912, by the Home Rule amendment, the people expressly ratified Denver's charter, including the section above quoted.

It has been held by this court that the legislature can grant and therefore the city can assume any power in matters of local concern, and that the legislature can grant and therefore the city can assume no power, except in matters of local concern. It follows from these holdings that what is of local concern and what the legislatures can grant are one and the same.

It seems to the writer that regulation of rates within the city is manifestly of local concern: however, the reason for the restriction of the city's powers to matters of local concern is that otherwise a state within a state would be created, and thus the constitution of the United States would be violated. Some of the arguments against the decision are upon the ground that the regulation of rates within the city is not of local concern and the right to regulate them could not be granted by the legislature. The whole force of this argument lies in the conclusion that the constitution of the United States would be violated. Were it not for that constitution the people of this state, by constitutional amendment, might grant to the city or any part of the state full sovereignty or independence or anything short of it. The question, therefore, is one under the constitution of the United States and it is our duty to

follow the decisions of the supreme court of the United States upon it; but that court has determined in the Home Telephone case that the power to regulate rates can be granted to the city, and that necessarily determines that such power is of local concern and that such grant does not violate the constitution of the United States. It is then our duty to hold likewise.

It has been argued that the Home Rule amendment ratified only what was "not in conflict with this article" and that the said provision of the charter was so in conflict because the article made no specific provision that that particular power might be assumed; that is to say, the charter is in conflict with something the article does not contain. With what part does it conflict? I cannot assent to such reasoning.

It is a part of the history of the state that the people were disappointed, not to say more, at the restrictions put upon the powers of cities by this court's interpretations of Article XX, and that the Home Rule amendment was the expression of that feeling. Upon points where this court has given the Article a restricted interpretation the Home Rule amendment reverses that interpretation. That they did not include regulation of rates must be because this court had not yet restricted the meaning of the Article on that point. But they expressed, in general terms broad as language permits, all powers which could be constitutionally granted upon the previous decisions of this court.

I cannot agree with the proposition that the power to regulate rates is not expressly granted by such language. An express grant of all power is an express grant of every power, and the ratification of Charter Sec. 280 is an express grant; a discussion, therefore, of the the question whether the power to regulate rates can be inferred or impliedly granted has no application to the question in hand.

I am authorized to state that Mr. Justice Allen concurs in this opinion.

Mr. Justice Scott dissenting:

The Public Utilities Commission of the State of Colorado, upon hearing, entered an order fixing rates for service to be charged by the Mountain States Telephone Company, within the State, including the City and County of Denver. The City objected to the jurisdiction of the Commission in the premises, as relates to the City and County of Denver, claiming exclusive jurisdiction to fix such rates as applied to the City under Art. XX of the constitution and the amendment thereto. The City did not appeal to the Supreme Court from the findings and decision of the Commission, as under the statute it was expressly authorized to do, but elected to permit such decision to become final, so that the merits of the case are not before us, and the controversy is now one of jurisdiction as between the city and the state.

Acting under Section 46 of the Public Utilities Act, and upon stipulation of parties, the commission certified to this court the record, for a decision upon the question of jurisdiction alone.

The powers of the Public Utilities Commission, under the Act of 1913, creating the Commission and defining its powers and duties, were considered and determined by this court in *Denver & S. P. Ry. Co. v. Englewood,* 62 Colo. 229, 161 Pac. 151, reserving however, a decision on the application of the rule in the case of a municipality organized and operating under Article XX of the constitution, and this is the question now before us for decision. Therefore the rule announced in that case must be held to apply here unless it shall be found that the Public Utilities Act of 1913. is inhibited by Article XX, and the amendment thereto. The Act Declares:

Sec. 14. "The power and authority is hereby vested in The Public Utilities Commission of the State of Colorado, and it is herby made its duty to adopt all necessary rates, charges and regulations, to govern and regulate all rates, charges and tariffs of every public utility within the state as herein defined, the power to correct abuses, and prevent unjust discriminations and extortions in the rates, charges

and tariffs of such public utilities of this state, and to generally supervise and regulate every public utility in this state and to do all things whether herein specifically designated, or in addition thereto, which are necessary or convenient in the exercise of such power, and to enforce the same by the penalties provided in this act, through proper courts having jurisdiction."

1.   In the *Englewood* case, speaking of the powers thus conferred, we said:   "This act is very broad and seems to confer the absolute power to regulate, both as to rates and otherwise, all public utilities within the state," and again, "From the sections quoted, and from other provisions of the act, it fully appears that the legislature intended to delegate to the Public Utilities Commission, the administration, supervision and regulation of all service rendered to the public, throughout the state, including municipalities."

The first comprehensive general public utility law enacted in this country, was the New York act of 1907, and which furnishes the model for many subsequent acts by the legislatures of other states, including our own.

The New York act created two districts with two commissions and with identical powers.   One of these districts consisted alone of the territory now embraced in the city of Greater New York, and therefore now embracing a single municipality.

The intention of the legislature by that act to include municipalities with the operation of the law is too plain to permit question.

It has been uniformly so held as to every other similar act, where the question has been raised.   It is obvious that the chief purpose of our act, as of all laws of that character by other states, was to generally regulate and fix rates for public utilities, such as water, gas, electric, telephone, and street car corporations, operating within municipalities, for, the then existing railroad commission act quite fully provided for such regulation of railroads. The kind of utilities so intended to be regulated, were to be found only in municipalities.   To say that the legislature intended to exclude

municipalities from the operation of the law, is to convict that body of either ignorance or wilful intent to violate the fundamental law.

Article XX is as much a part of the constitution of the state as if it had been a part of the original instrument and is of like force and sanctity.

Then to sustain the contention of the city, it is plain that we must hold the Public Utilities statute of 1913, to be in derogation of the constitution, to the extent at least, as the act may apply to cities of two thousand population or more, and for such reason to be void.

2.   It has been uniformly held since the case of *Ogden v. Sanders,* 12 Wheaton 214, 6 L. Ed. 606, that the presumption is that every statute is a constitutional enactment, and that this presumption is not overcome, until the contrary appears beyond a reasonable doubt.

This doctrine has been repeatedly affirmed by this court. *Consumers League v. C. & S. Ry. Co.,* 53 Colo. 54, 125 Pac. 577, Ann. Cas. 1914 A. 1158, where our cases involving the subject up to that time, are collated and cited.

The rule then by which we must be governed in this particular is, that when an act of the legislature is attacked as in violation of the constitution of the United States or of the state, we are required to uphold the legislation, unless its unconstitutionality appears beyond all reasonable doubt.

We are asked in this case to declare an act void, not such as affects merely the private or public rights or wrongs of persons, or the rights of property in a general way, but on the contrary, a legislative act in which the state asserts the exercise of its inherent and sovereign power, as against the claim to such power upon the part of a municipality within its own borders.

3.   There is another cannon of construction which may not be overlooked in this case, and that is the deference and weight which the court must give to a practical contemporaneous legislative construction of a constitutional provision.

The amendment to Article XX of the constitution, known

as the "Home Rule" amendment, and upon which the city relies, was adopted at the November, 1912, election, being the same general election at which all the members of the legislature, except a moiety of the senate, were elected and which legislature enacted the public utility act of 1913, now under consideration.

It may be noted that not one vote in either house of the assembly was cast against the bill upon its passage therein, so that the representatives of every city in the assembly, operating under, or which may operate under Article XX, voted for the statute. The legislative act then is clearly a contemporaneous construction by the legislative branch of the state government, of the constitutional amendment now under consideration.

It is universally held that contemporaneous or practical construction of an ambiguous provision of a constitution by the legislative or executive departments of the government is always important, and is frequently of controlling influence in determining its meaning. 12 C. J. 712.

And the rule seems likewise to be general that if the meaning of the constitution is doubtful, legislative construction will be given serious consideration by the courts, both as a matter of policy, and also because it may be presumed to represent the true intent of the instrument. A contemporaneous legislative exposition of a constitutional provision is entitled to great deference, as it may be well supposed to result from the same views of policy and modes of reasoning which prevailed amoung the framers of the instument expounded. 12 C. J. 714.

This rule of construction of a constitutional provision has been accepted many times by this court. In *People ex rel. Livisay v. Wright*, 6 Colo. 92, where there was quoted with approval the following:

"As in regard to statutes, so in regard to constitutions, contemporaneous and legislative expositions are frequently resorted to, to remove and explain ambiguities * * * *.

Great deference is due to a legislative exposition of a constitutional provision, and especially when it is made

almost contemporaneously with such provision, and might be supposed to result from the same views of policy and modes of reasoning which prevailed among the framers of the instrument expounded. Sedwick stat. and Const. Law, 412; *People v. Green*, 2 Wend. 266, 274."

And in *Frost v. Pfeiffer*, 26 Colo. 338, 58 Pac. 147, the court said:

"Contemporaneous legislative construction of the fundamental law, while not controlling upon the courts, yet in case of doubt or ambiguity, is entitled to great weight, as expressive of the views entertained by those of the meaning of that law whose mandates they are bound to observe. *Cooper Mfg. Co. v. Ferguson*, 113 U. S. 727, 28 L. Ed. 1137, 5 Sup. Ct. 579; *People v. LeFever*, 21 Colo. 218, 40 Pac. 882."

In *Denver v. Adams Co.*, 33 Colo. 1, 77 Pac. 858, it was said:

"While it is not conclusive with the courts, nevertheless a contemporaneous legislative construction of a statute or constitutional provision is persuasive."

In *Cooper Mfg. Co. v. Ferguson*, 113 U. S. 727, 28 L. Ed. 1137, 5 Sup. Ct. 739, it was held that as the clause in the constitution and the act of the legislature relate to the same subject, like students in pari materia, they are to be construed together. And that an act passed by the first legislature that assembled after the adoption of the constitution, must be considered as a contemporary interpretation, entitled to much weight.

The court must take notice of the fact that the adoption of the "home rule". amendment to Art. XX was of statewide interest and the subject of much discussion while pending.

We cannot assume that the members of the legislature elected at the same election, were not therefore familiar with the intent and purpose of this amendment to the organic law, nor that they had the intent to knowingly or wilfully act in violation thereof. Therefore in considering the question of the validity of the Public Utilities Act, we

must bear in mind the two foregoing important and universally accepted canons of construction.

4. It is well to consider the nature and charcter of the power which the city claims in this case.

It is universally held that the power to fix minimum rates is a power resting exclusively in sovereignty. Sovereignty has been judicially defined as the supreme power which governs the body politic, or society which constitutes the state; a term used to express the supreme political authority of an independent state or nation; the aggregate of all civil and political power; the supreme, absolute, uncontrollable power by which a state is governed; that public authority which directs or orders what is to be done by each member associated, in relation to the end of the association. 36 Cyc. 516.

Preliminary to the adoption of the Federal Constitution there was grave apprehension as to possible or probable conflict between the several coordinate branches of the government. The suggestion of Thomas Jefferson in his "Notes on the State of Virginia" seems to have since been followed in every serious or crucial conflict between the powers of government. His statement, in which he likewise gave further definition of sovereignty as then contemplated, is as follows:

"As the people are the only legitimate fountain of power, and it is from them that the constitutional charter, under which the several branches of government hold their power, is derived, it seems strictly consonant to the republican theory to resort to the same original authority not only when it may be necessary to enlarge, diminish, or new-model the powers of the government, but also whenever any one of the departments may commit encroachments on the chartered authorities of the others. The several departments being perfectly coordinate by the terms of their common commission, neither of them, it is evident, can pretend to an exclusive or superior right of setting the boundaries between their respective powers, and how are the encroachments of the strong to be prevented, or the wrongs of the

weaker to be redressed, without an appeal to the people themselves, who as the grantors of the commission, can alone declare its true meaning, and enforce its observance."

This sound governmental truth has been made manifest by its frequent application in both state and nation. The several branches of the government are but the creatures of the sovereign power, and always subject to the exercise of the sovereign will. This is illustrated by the recent constitutional enactment in this state of the power of the initiative and referendum where theretofore exclusive powers of the assembly, were taken away and reserved to the people themselves, to initiate statutes and constitutional amendments, and also to veto statutes enacted by the assembly.

The argument by the city assumes that sovereign power is divisable, separable and alienable, like bushels of grain, rather than as the life-saving air of government, indivisable, inseparable, perpetuating the equilibrium in government and serving as a system of checks and balances as between not only the co-ordinate branches of government, but all the agencies of government, as well.

5.    It is to be observed that in all governments of constitutional limitations, sovereign power manifests itself in three ways; by exercising the right of taxation; the right of eminent domain, and through its police power.

The exercise of sovereign right is of necessity the exercise of a right which the state alone, or some of its governmental agencies possess, and before such right may be exercised by any such agency there must have been a delegation of such power in terms clear and unmistakable. This is not only the rule of this court, but it is universal with all courts.    In the Englewood case we quoted with approval the following:

"In *Freeport Water Co. v. Freeport, supra,* [80, U. S. 587, 45 L. Ed. 679, 21 Sup. Ct. 493], it is said: 'This power of regulation is a power of government, continuing in its nature; and if it can be bargained away at all, it can only be by words of positive grant, or something which is in

law equivalent. If there is reasonable doubt, it must be resolved in favor of the existence of the power. In the words of Chief Justice Marshall in *Providence Bank v. Billings,* 4 Pet. 514, 561, 7 L. Ed. 939, 955, 'Its abandonment ought not to be presumed in a case in which the deliberate purpose of the state to abandon it does not appear.' "

Upon this point it was said in *Interstate Commerce Com. v. Railway Co.,* 167 U. S. 479, 42 L. Ed. 243, 17 Sup. Ct. 896:

"The question debated is whether it vested in the commission the power and the duty to fix rates, and the fact that this is a debatable question, and has been most strenuously and earnestly debated, is very persuasive that it did not. The grant of such a power is never to be implied. The power itself is so vast and comprehensive, so largely affecting the rights of carrier and shipper, as well as indirectly all commercial transactions, the language by which the power is given had been so often used and was so familiar to the legislative mind and is capable of such definite and exact statement, that no just rule of construction would tolerate a grant of such power by mere implication.' "

Further citation of authority is not required. There are none to the contrary.

The power to regulate public utilities is based upon that branch of sovereignty designated as the police power of the state. The term police power has never as yet been accurately or satisfactorily defined. The difficulty is that it is from its very nature incapable of definition, because none can foresee the ever-changing conditions which may call for its exercise. But it is by all agreed that it is an attribute of sovereignty, inherent in the several states of the Union, subject only to the limitations of the Federal Constitution, and that the very existence of government depends on it. It is as a well, inexhaustible, from which may be drawn from time to time the power necessary to protect or promote the public welfare.

It is a fixed principle of government that the state can

not barter away the right to the use of the police power, for the reason that the governmental power of self-protection can not be contracted away.

This furnishes the reason for the rule announced in *Denver Co. v. Englewood, supra,* that the power of regulation of public utilities is a power of government, continuing in its nature; and if it can be bargained away at all, it can only be by words of positive grant, or something which is in law equivalent, and that if there is reasonable doubt, it must be resolved in favor of the existence of the power in the state.

While the state may delegate the exercise of this power to an agency, municipal or otherwise, yet there can be no alienation. That is to say, here the same authority that granted the power under Article XX, acting through the same instrumentality, may recall this power in its entirety. We turn to Art. XX and search in vain for words expressly granting the power to the city to regulate or fix rates to be charged by any public utility. Indeed, there is no language therein even suggestive of any such grant of power, nor is the subject referred to.

6. The city in its contention apparently relies upon the following provisions of Sec. 6, Art. XX, as amended, as conferring the power claimed:

1. "The people of each city or town in this state, having a population of two thousand inhabitants as determined by the last preceding census taken under the authority of the United States, The State of Colorado or said city or town, are hereby vested with, and they shall always have, power to make, amend, add to or replace the charter of said city or town, which shall be its organic law and extend to all ITS LOCAL AND MUNICIPAL MATTERS.

2. Such charter and the ordinances made pursuant thereto in such matters shall supersede within the territorial limits and other jurisdiction of said city or town any law of the state in conflict therewith.

to the people of all municipalities coming within its provisions the FULL RIGHT OF SELF GOVERNMENT IN BOTH LOCAL AND MUNICIPAL MATTERS, and the enumeration herein of certain powers shall not be construed to deny to such cities and towns, and to the people thereof any right or power essential or proper to the full exercise of such right.

4. The statutes of the State of Colorado, so far as applicable, shall continue to apply to such cities and towns, except in so far as superseded by the charters of such cities and towns or by ordinance passed pursuant to such charters.

5. All provisions of the charter of the City and County of Denver and the cities of Pueblo, Colorado Springs, and Grand Junction, as heretofore certified to and filed with the Secretary of State, and of the Charter of any other city heretofore approved by a majority of those voting thereon and certified to and filed with the Secretary of State, WHICH PROVISIONS ARE NOT IN CONFLICT WITH THIS ARTICLE, and all elections and electoral votes heretofore had under and pursuant thereto, are hereby ratified, affirmed and validated as of their date."

It will appear that in this amendment there is no suggestion of a grant of power to fix rates to be charged by a public utility. What would be said of the powers of the Public Utility Commission, if its grants of power under the statute creating and controlling, were so obscure or rather so invisible.

There are two universally accepted rules of construction by which the court must be governed in determining whether or not these provisions of the constitution, or any one of them, may be held to confer upon the city the rate regulating power over public utilities within the city. The first of these is, that the provision or provisions of the constitution must appear to as clearly express the power claimed to have been conferred on the city, and in language as free

from ambiguity, as those provisions of the statute alleged to be in conflict with the organic law.

The second rule is that laid down by the Supreme Court of the United States in the case of *Milwaukee Ry. Co. v. Wisconsin Ry. Com.* 238 U. S. 174, 59 L. Ed. 1254, 35 Sup. Ct. 820:

"The fixing of rates which may be charged by public service corporations, of the character here involved, is a legislative function of the State, and while the right to make contracts which shall prevent the State during a given period from exercising this important power has been recognized and approved by judicial decisions, it has been uniformly held in this court that the renunciation of a sovereign right of this character must be evidenced by terms so clear and unequivocal as to permit of no doubt as to their proper construction. This proposition has been so frequently declared by decisions of this court as to render unnecessary any reference to the many cases in which the doctrine has been affirmed. The principle involved was well stated by Mr. Justice Moody in *Home Telephone Co. v. Los Angeles*, 211 U. S. 265, 273:

'The surrender, by contract, of a power of government, though in certain well-defined cases it may be made by legislative authority, is a very grave act, and the surrender itself, as well as the authority to make it, must be closely scrutinized.

No other body than the supreme legislature (in this case, the legislature of the State) has the authority to make such a surrender, unless the authority is clearly delegated to it by the supreme legislature. The general powers of a municipality or of any other political subdivision of the State are not sufficient. Specific authority for that purpose is required.' "

This language was spoken of grants by the legislature as representative of the sovereign power of the state. If it shall apply in such case, then with what greater force

should it be regarded when applied to constitutional grants of power.

It is plain that the specified class of cities were thus granted power to make or amend a charter, applicable and specifically limited to its "local and municipal matters," and the declared purpose was, to grant to the municipalities as such, the full right of self government, "limited to local and municipal matters." The same power was granted to all other cities having a population of two thousand or more. The people of the state could have had in mind municipal powers only, except as otherwise conferred by express grant.

Nowhere in the provisions quoted can there be found any express delegation of power to fix maximum rates to be charged by public service corporations, and by no intelligent interpretation can this language be construed to intend an implied power to so do.

Of all things to be sacredly avoided by the court is the possibility of error in a construction, that may be the equal to rewriting the organic law to that extent, and thereby to unconsciously usurp the constitution making power of the people.

It may be noted further, that in the home rule amendment, in addition to the general powers, upon which the city relies in this case, there is provided eight express grants of power. They relate in brief to, (a) The creation of municipal officers, terms, duties, etc., (b) the creation of police courts, powers, duties, etc., (c) the creation of municipal courts, etc., (d) matters pertaining to municipal elections, etc., (e) providing for municipal obligations, etc., (f) providing for the consolidation and management of park and water districts, (g) providing for assessments of city property for municipal purposes, collection of such taxes, etc., and (h) providing for the imposition and collection of fines for the violation of provisions of the city charter and ordinances.

Article XX was enacted several years before this amendment and some of these powers had been questioned.

All of these express grants relate in a general way to local and municipal matters only, and it was clearly the purpose of the amendment to relieve such powers from doubt, and of the necessity for judicial interpretation. If such was the purpose, it is pertinent to ask, why such care to specifically express and recite powers, in their nature local and municipal, and omit entirely any express reference to a power, universally held to be general and sovereign in character, if such power was intended to be conferred. This fact alone is sufficient to create the doubt which must necessarily under the rule of construction, control the court's action in this case.

Is it possible that any elector could have read these provisions of the proposed amendment, which are quoted here, and have concluded that it was the intent and purpose of it, to confer upon these cities the exclusive power to fix compulsory rates to be charged by public service corporations, a municipal grant then certainly uncommon, if not unprecedented in any state in the Union.

7. It is urged that prior to the adoption of the home rule amendment there was inserted in the charter the following:

"All power to regulate the charges for service by public utility corporations is hereby reserved to the people, to be exercised by them in the manner herein provided for the initiation of an ordinance."

It is then argued that by the ratification provision, as to the four cities named therein, this charter provision became an express constitutional grant of power to the city to regulate such charges. But there is an express limitation upon the provisions of the charter so ratified, and they were strictly confined to "provisions not in conflict with this article." But if Art. XX and the amendment thereto contained no express power to regulate charges for service by public utility corporations, then the provision of the charter relied on, was in conflict with Art. XX,

and for such reason void under the very terms of the amendment.

The ratification provision in the amendment expressly extended to such provisions of the charter only, as were not in conflict with the original Article XX, and hence in plain terms did not ratify such attempted reservation of power. That the city was without power to prescribe compulsory rates to be charged by public utilities, under Article XX before the amendment, and that therefore the declaration to the effect found in the charter, before the amendment, was in conflict with such Article, and for such reason is void, is the crux of this controversy, and we believe our conclusion finds confident and irresistible support in the authorities to follow. If it was void, it could not be, and by the terms of the amendment itself, was not ratified.

Municipalities have no express or implied powers, excepting only such as may be conferred by sovereignty. It would be a strange anomaly to say that a municipality can reserve to itself a power resting exclusively in sovereignty. Certainly it cannot be said that a municipality has inherent power. If so then it is sovereign, and constitutes a government within a government, an *imperium in imperio.* The ratification of the provisions of the charter and valid ordinances, not in conflict with the article, did not make them a part of the constitution. It is true this ratification being constitutional in character, such provisions as are valid, are immune from legislative act, but they were still only valid provisions of a municipal charter, always subject to amendment or repeal by the people of the city.

If we suppose that the charter had contained a provision declaring all power to regulate the liquor traffic "is hereby reserved to the people to be exercised by them in the manner herein provided, for the initiation of an ordinance," and so far as the people who voted upon the amendment knew, there may have been such a provision, what would be said of the validity of the then state-wide anti-saloon

law. It would have been the exercise of the same general and sovereign police power as in the case of the regulation of public utilities.

Could it have been said that such a provision was ratified by the amendment to Art. XX. And there is to be found in Art. XX and the amendment no more explicit grant of power to regulate public utilities than to regulate the liquor traffic.

The illustration demonstrates the wisdom, necessity and purpose of the limitation contained in the amendment, "not in conflict with this article." The people could know the provisions of the amendment. They could have no knowledge of the charter provisions, nor the ordinances under it.

The constitutional amendment can be said to have done no more than to validate such charter provisions as were clearly within the lawful powers of the municipality. It was plainly not intended to confer a new or different power, not theretofore expressly conferred, or necessarily implied by Article XX, for as said in the Sours case, 31 Colo. 369, 174 Pac. 167, 102 Am. St. 34:

"Even by constitutional amendment the people cannot set apart any portion of the State in such manner that that portion of the state shall be freed from the Constitution, or delegate the making of constitutional amendments concerning it to a charter convention, or give to such charter convention the power to prescribe the jurisdiction and duties of public officers with respect to State government as distinguished from municipal or city government."

8. The power to regulate and control all public utilities of the state by means of a commission for that purpose is not entirely new or untried. So far as we are able to discover, all such statutes include within such exercise of authority, the regulation of public utilities within the cities of the state, whether the municipal powers rest upon constitutional or statutory grant.

These laws may now be said to be general, and to constitute a definite policy for the regulation and control of all public utilities. They include among the acts of regulation, the issuance of stocks and bonds, the question of necessity for construction or extension and many other matters and things not contemplated by the earlier regulation statutes which were confined to railroads alone. Indeed, it may be said that the regulation of those public utilities operating chiefly in large centers of population is the paramount purpose. The enactment of similar statutes has followed in most of the states of the Union, and the state's general power to regulate all the public utilities, without distinction as to municipalities, has been asserted and exercised under all such statutes.

So far as we are advised this power has never been questioned in most of the states, by the cities, whether operating under constitutionally conferred charter power or otherwise. But the question has been raised in some of the states of the Union, and in so far as we are advised, in all cases, determined adversely to the contention of the city in this case.

We will now proceed to cite and briefly consider some of these cases. In the recently decided case of the *Cleveland Tel. Co. v. The City of Cleveland,* by the Supreme Court of Ohio, 98 O. St. 358, 121 N. E. 701, which as in this case, involved only the question of jurisdiction to fix maximum rates for the telephone company within the city of Cleveland, as between the city and the public utilities commission of the state.

The city enacted an ordinance fixing the maximum rates and brought the action to enjoin the commission from enforcing other and different rates fixed by that body. The city claimed under a constitutional provision granting home rule as here, and it was held that the public utilities statute creating the commission and conferring authority upon it to regulate public utilities, and to fix the rates that

such utilities may charge for commodity furnished or service rendered, gave exclusive powers to the commission.

It was contended in that case, as in this, that the authority conferred by the constitution upon municipalities to exercise all powers of local self government, necessarily included as an incident thereto, police power in the broader sense of that term, and authorized the fixing of rates that may be charged by public utilities within the city.

It appears that under the home rule amendment to the constitution of Ohio, municipalities were given quite as broad and general powers for self government as ·are to be found in the constitution of this state. It was said in that case:

"The exercise of local police power is of vital importance to large centers of population. If police powers may be divided along the lines suggested, it is of far more importance to municipalities that they should have authority to exercise local police power untrammelled by the general laws of the state, than that they should have absolute right to exercise the police powers included in the broader definition suggested by counsel; and yet Section 3, Art. XVIII of the constitution, does limit and restrict municipalities to the exercise of local police power in conformity with the general laws of the state.

"If municipalities were independent sovereignties, there might be some force in the contention that they possess inherent police power incident to sovereignty, especially if the constitution imposed no limitations upon the exercise of that power, but even the most ardent supporters of independent sovereignty in the constitutional convention were obliged to abandon that idea. (2 Constitutional Debates, p. 1456, column 2.) That question, however, is fully settled in the case of *Billings v. Cleveland Ry. Co.,* 92 Ohio St. 478, 485, 11 N. E. 155, in this language:

" 'There is no imperium in imperio, except in the sense that by the approval of the state the city exercises part of the sovereign power under the limitations imposed.'

"While in this state local police powers have uniformly been delegated to local authorities to be exercised in conformity with general laws, in order to meet the needs of urban districts, nevertheless, police power is an attribute to sovereignty, and the exercise of that power largely in the discretion of the sovereign state. * * *

"It is hardly within the range of possibility, much less probability, that the people of this state intended to vest in the many municipalities of Ohio discretion to exercise unlimited and unrestricted police power."

In the case of *Traverse City v. Railroad Com.*, 202 Mich. 565, 168 N. W. 481, the precise question of jurisdiction as between the state commission and the constitutionally chartered city, likewise involved the regulation of rates to be charged by a telephone company.

The authorities were quite generally reviewed and the court said:

"Neither the Railroad Commission nor the municipality had any rate-making power, except that which the legislature might delegate to them to exercise as state agencies. There is no doubt that it is competent for the legislature to delegate its control over and power to regulate charges of common carriers operating within the state to a board or commission created for that purpose and within the range of legitimate municipal purposes to municipalities, but when such power is delegated to a municipal corporation by its charter it must be done in express terms. *Jacksonville v. Bell Tel. Co.*, 96 Mo. 623, 10 S. W. 197, 2 L. R. A. 278, 9 Am. St. Rep. 370. No power is given Traverse City by its charter in express terms to fix rates to be charged by telephone companies operating within its borders, nor is such authority inferable from the conferred power to regulate and control the use of its streets by telegraph, telephone, and other companies referred to."

The case of *City of Portland v. Public Service Com.*, 89 Ore. 325, 173 Pac. 1178, has peculiar likeness to the case

at bar, and is determined upon the question of jurisdiction alone.

The constitutional power in that case granted to municipalities in the matter of their charters and ordinances, was limited to "local, special and municipal" legislation, while in the Colorado constitution, this power is limited to "matters local and municipal," omitting the word "special." So that in effect the power granted in this respect is the same; that is to say the power extends in the absence of an express grant, to matters municipal only.

In that case the court said:

"That the regulation of rates is a prerogative of the state as to carriers operating wholly within its borders is taught in *Simpson v. Shepard,* 230 U. S. 352, 33 Sup. Ct. 729.

The case of the plaintiff is not aided by the subsequent amendments to the charter, whereby the effort was to invest the municipality with substantially all the authority over public utilities operating within the city that was conferred upon the Commission.

There are two reasons for this. One is that, although the city by these changes in its organic law asserted the right to regulate rates, it has not exercised the right. Another is that the scope of the initiative and referendum power vested in the legal voters of municipalities is confined to 'local, special and municipal legislation.' Article 4, sec. 1a, State Constitution. This section explains and limits the language of section 2 of Article 11 of the same instrument, authorizing the legal voters of cities and towns 'to enact and amend their municipal charter, subject to the Constitution and criminal laws of the state of Oregon,' with the result that the city is debarred from assuming on its own initiative a power which is peculiarly a prerogative of the state itself. Regulation of rates is such a power. It affects the general public, and not merely the inhabitants of any single city, and never could have been exercised by the plaintiff, unless delegated to it by the state.

The constitutional provisions for 'local, special and municipal legislation' by the initiative were never intended as permission to cities and towns to arrogate to themselves powers otherwise primarily resident in the state. All authority whatever possessed by cities and towns emanated from the state. They cannot further invade its original sovereign prerogative, unless the attempt is referable to 'local, special and municipal legislation.' The state, operating through its legislative assembly or directly by its people, exercising the initiative, is still paramount in the matter of making laws. It can delegate authority to its subordinate governmental agencies, and it can revoke it."

*State ex rel. v. Telephone Co.,* 189 Mo. 83, 88 S. W. 411, involved the precise question now under consideration. In that case the city was operating under specific constitutional authority to frame its own charter as follows: "Any city having a population of more than one hundred thousand may form a charter for its own government, consistent with and subject to the constitution and laws of this state."

The charter framed under this constitutional provision and certain additional statutory provisions, contained a provision in substance as follows:

"The city shall have power by ordinance * * * to regulate the prices to be charged by telephone, telegraph, gas and electric light companies, and to compel them and all persons and corporations using, controlling or managing electric wires, for any purpose whatever to put and keep their wires under ground and to regulate the manner of doing the same."

The court held that this ordinance insofar as it related to the compulsory maximum rate making power, was void as against the asserted power of the state in that respect. It was there said:

"A charter framed under that clause of the constitution within the limits therein contemplated has the force and effect equal to one granted by an act of the legislature.

But it is not every power that may be essayed to be con-

ferred on the city by such charter that is of the same force
and effect as if it were conferred by an act of the General
Assembly, because the Constitution does not confer on the
city the right, in framing its charter, to assume all the pow-
ers that the State may exercise within the city limits, but
only powers incident to its municipality, yet the legislature
may, if it should see fit, confer on the city, powers not
necessary or incident to the city government.   There are
governmental powers the just exercise of which is essential
to the happiness and well being of the people of a particular
city, yet which are not of a character essentially appertain-
ing to the city government.   Such powers the State may re-
serve to be exercised by itself, or it may delegate them to
the city, but until so delegated they are reserved.   The
words in the Constitution 'may frame a charter for its own
government,' mean may frame a charter for the govern-
ment of itself as a city, including all that is necessary or
incident to the government of the municipality, but not all
the power that the State has for the protection of the rights
and regulation of the duties of the inhabitants in the city,
as between themselves.   Nor does the constitution confer
unlimited power on the city to regulate by its charter all
matters that are strictly local, for there are many mat-
ters local to the city, requiring governmental regulation,
which are foreign to the scope of municipal government."

Mr. Justice Marshall in a specially concurring opinion
in that case, declared:

"I am thoroughly persuaded that it never was within the
contemplation of the framers of our system of government,
or of our Constitution, that any city, whether organized
under the general laws of this state, or under the provisions
of the Constitution which allow cities to frame their own
charter, to confer upon cities anything more than a police
power, and a strictly municipal power.   And that the power
to enact all laws of civil conduct, and to prescribe all civil
remedies among citizens, in short, to enact laws as distin-
guished from municipal regulations, is expressly reserved

to the Legislature of this state, and cannot be delegated by it."

Perhaps the most exhaustive and convincing opinion of any of those dealing with the subject now under consideration is that of *City of Woodburn v. Public Service Com.,* 82 Oregon 114, 161 Pac. 391, L. R. A. 1917C, 98, Ann. Cas. 1917E, 996. The city of Woodburn was operating under a home rule provision of the constitution of the State of Oregon, which conferred the power upon municipalities.

"To grant franchises in, through and upon the streets of the city for public uses and public benefits; and to regulate and control or prohibit the placing of poles for electric lights or other purposes, and the suspension of electric and other wires along on cross-streets of said city, and to require any or all already placed or suspended, either in limited districts or throughout the entire city, to be removed, or to be placed in such manner as it may designate beneath the surface of the streets or sidewalks."

The city granted a franchise to the telephone company, one section of which fixed the maximum rates to be charged for telephone service. Upon application and hearing, the Public Service Commission fixed a schedule of rates higher than that fixed by the franchise. The Public Service Act was passed after the franchise was granted and thus arose the question of jurisdiction as between the city and the state.

The constitution of Oregon also denied the right of the legislature to amend or repeal any city charter in the following language:

"Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws. The legislative assembly shall not enact, amend, or repeal any charter or act of incorporation for any municipality, city, or town. The legal voters of every city and town are hereby granted power to enact and amend their

municipal charter, subject to the Constitution and criminal laws of the State of Oregon."

It was said:

"While the Constitution grants to a city the right to enact and amend its charter and simultaneously prohibits the legislative assembly from enacting, amending or repealing any charter for any city, nevertheless, neither the grant nor the prohibition includes any subjects except those 'that are purely local and municipal in character.' (*Kalich v. Knapp*, 73 Or. 558) (142 Pac. 594, 145 Pac. 22, Ann. Cas. 1916E, 1051), or, as is stated in *Branch v. Albee*, 71 Or. 188, 205, (142 Pac. 598), the authority of the cities is not extended 'over subjects that are not properly municipal and germane to the purposes for which municipal corporations are formed. We use the word 'municipal' as signifying what belongs to a city."

In *Coleman v. LaGrande*, 73 Ore. 521, 525 (144 Pac. 468, 470), this court ruled that:

"By granting and reserving to the people of municipalities the power to enact and amend their charters and adopt local or special laws, the state has not surrendered her sovereignty to the municipalities. Within their boundaries cities are clothed with power to regulate matters purely local. However, a city is not constituted as a sovereignty as regards all matters of legislation, but is still to a certain extent a mere agency of the state of which it is a part. Beyond such municipal boundaries and in matters of general concern not pertaining solely to local municipal affairs, cities are amenable to the general laws of the state, which do not infringe upon the right of cities to local self-government. This is so whether such laws are enacted by the legislature or by the people of the state at large.

The right to regulate rates is a matter of general concern and does not pertain solely to local municipal affairs: *Portland Ry. Light & Power Co. v. City of Portland* (D. C.) 210 Fed. 667."

It was further said:

"The state guards its right to regulate rates so vigilantly that specific authority is necessary to compel a surrender of this element of sovereignty and in the language of the Supreme Court of the United States:

'The general powers of a municipality or of any other political subdivision of the state are not sufficient: *Home Telephone Co. v. Los Angeles*, 211 U. S. 265, 53 L. Ed. 176, 29 Sup. Ct. Rep. 50; *Milwaukee Elec. Ry. v. Wisconsin R. R. Com.*, 238 U. S. 174, 59 L. Ed. 1254, 35 Sup. Ct. Rep. 820.

The power to regulate rates does not appertain to the government of a city; it is not municipal in character, nor is it even an incident to a grant of authority to enact or amend a charter for a city or town. *State ex rel Webster v. Superior Court*, 67 Wash. 37 (120 Pac. 861, Ann. Cas. 1913D, 78 L. R. A. 1915C, 287)."

It will be noted that the constitution in that state uses the term "local and municipal," the precise limitation placed upon the powers of municipalities, found in our own constitution.

No case has been cited in the briefs, and we have no knowledge of any decision by a court of last resort, state or federal, expressing a contrary view to that of the cases here reviewed and cited.

To the same effect and of the same import as the foregoing cases, may be cited:

*Milwaukee Elec. Co. v. R. R. Com.*, 238 U. S. 174, 35 Sup. Ct. 820, 59 L. Ed. 1254; *Freeport Water Co. v. Freeport*, 180 U. S. 587, 21 Sup. Ct. 493, 45 L. Ed. 679; Salt *Lake City v. Utah Light & Traction Co.* (Utah), 173 Pac. 556; *Idaho Power & Light Co. v. Bloomquist*, 26 Idaho 222, 141 Pac. 1083, Ann. Cas. 1916E, 282; *Light & Power Co. v. Portland* (D. C.) 210 Fed. 672; *Benwood v. Public Service Com.*, 75 W. Va. 127, 83 S. E. 295, L. R. A. 1915C, 261; *Webster v. Superior Court*, 67 Wash. 37, 120 Pac. 861, L. R. A. 1915C, 287, Ann. Cas. 1913D, 78; *Wolverton` v. Telephone Co.*, 58 Colo. 58, 142 Pac. 165, Ann. Cas. 1916C, 776; *City of St. Louis v. Public Service Com.* (Mo.) 207

S. W. 799; *Public Service Com. v. City of Helena,* 52 Mont. 527, 159 Pac. 24; *Yuma Gas, Light & Water Co. v. City of Yuma* (Ariz.) 178 Pac. 26.

9.  Counsel strenuously contend that the cases here cited are not authority in this case by reason of alleged distinction between the language of our constitution and the wording of constitutional limitation of charter powers in those states. It is said that in some of these states the words are, "not in conflict with the constitution and laws of this state." In others "not in conflict with the constitution and criminal laws of this state," while in the Colorado constitution the limitation is as to "local and municipal matters."

This is a distinction without a difference. These limitations all have the same meaning in effect, and that is to limit the powers under the charter to matters municipal in character as distinguished from general or sovereign powers.

In none of the decisions we have reviewed, nor in any of the cases cited therein, is there any intimation that rate and service regulations of public utilities are matters of local or municipal concern. But on the contrary it is stated in all of them that this power is governmental, and is vested in the state in its sovereign capacity, which completely negatives the idea that it is merely local.

These authorities are in harmony with the true spirit of the "Home Rule" provision of the Colorado constitution. The clear intention of the amendment undoubtedly was to confer upon the cities coming within the class created by the amendment, the power and authority to exercise complete control over their local and municipal matters. This has been the universal conclusion reached in substance and in fact by the Colorado decisions.

10.  Counsel for the city seem to regard the word "local" as having some peculiar significance, and in some manner enlarging upon the word "municipal." Why or how is not clear from the argument. If the word "local" can have any different meaning from the word municipal in this re-

spect, it is to restrict rather than to enlarge, for it can mean no more than that the power is local to the municipality as distinguished from general, as applied to the state.

But in a number of cases before this court construing Article XX and the amendment thereto, this contention has been expressly and uniformally repudiated.

Therefore to say that the charter powers of the city under the constitution, extends beyond its municipal affairs, except where otherwise expressly provided, is to overrule a line of cases of this court with express declarations to the contrary, and we are not required to rely upon the decisions from other courts for authority.

In the case of *People v. Sours,* 31 Colo. 369, 74 Pac. 167, 102 Am. St. 34, the contention was that Art. XX was invalid for the reason that it was a grant of powers other than municipal in their nature, that is to say it was a grant of powers general and sovereign in character and therefore in conflict with the Federal constitution. This is the precise contention of the city in the case at bar. The answer of the court to that contention, speaking through Mr. Justice Steele, was:

"If this amendment must be given that construction, it cannot be sustained. Even by constitutional amendment, the people cannot set apart any portion of the state in such manner that that portion of the state shall be freed from the constitution, or delegate the making of constitutional amendments concerning it to a charter convention, or give to such charter convention the power to prescribe the jurisdiction and duties of public officers with respect to state government as distinguished from municipal, or city, government. * * * Under the constitution of the United States the state government must be preserved throughout the entire state; and it can be preserved only by having within every political subdivision of the state, such officers as may be necessary to perform the duties assumed by the state

government, under the general laws as they now exist or as they may hereafter exist.

This distinction between the governmental duties of public officers and their municipal duties is fundamental and therefore is not avoided or affected by the consolidation."

Finally construing the purpose of the amendment, in its authorization to the city to adopt a charter, and enact ordinances as being limited to matters of local and municipal concern only, the court said:

"The amendment is to be considered as a whole, in view of its expressed purpose of securing to the people of Denver absolute freedom from legislative interference in *matters of local concern;* and, so considered and interpreted, we find nothing in it subversive of the state government, or repugant to the constitution of the United States."

This doctrine has in no sense been modified or abridged, but has been repeatedly affirmed.

The precise claim to sovereign and general police power upon the part of the city was made in the case of *Keefe v. The People,* 37 Colo. 317, 87 Pac. 791, 8 L. R. A. (N. S.) 131, as here. It was there contended that the state statute providing for an eight hour law was not applicable to the city and county of Denver, because such power of regulation had been conferred upon the city by Art. XX. Speaking through Mr. Justice Gabbert, it was held:

"But the municipality of Denver, though created by a constitutional amendment by a direct vote of the people, and having the power to frame its own charter, is just as much an agency of the state for the purpose of government as if it was organized under a general law passed by the general assembly. The mode of its creation does not change the nature of its relation to the state. Like cities and towns organized under the general statutes, it is still a part of the state government. It is as much amenable to state control in all matters of a public, as distinguished from matters of a local character, as are other municipalities. The state

still has the supreme power to enact general laws declaring what shall be its public policy, and it can make them applicable to the city of Denver, as well as to all other cities of the state. This act, in effect, declares that it is the public policy of the state not to permit any officer or agent of the state, or its municipalities, or any contractor thereof, to employ any working man in the prosecution of public work for more than eight hours a day, and for a violation of the statute a penalty is provided. What the public policy of the state is, rests with its legislative department. The work of building a sanitary sewer by a city, in a sense, is local, in that it affects, primarily, its own citizens; but it is directly connected with the public health, and is a matter of concern and great importance to the people of the entire state."

In the case of *Speer v. People,* 52 Colo. 325, 122 Pac. 768, speaking through Mr. Justice Musser, the court said:

"Section 5 of Article XX of the constitution expressly provides that, 'The citizens of the city and county of Denver shall have the exclusive power to amend their charter or to adopt a new charter, or to adopt any measure as herein provided.' The citizens of this municipality *so far as concerns their local municipal matters,* have all the powers of a legislature with respect to their charter. *Denver v. Hallett,* 34 Colo. 393; *Londoner v. City and County of Denver,* 119 Pac. 156."

In the case of *Hilts v. Markey,* 52 Colo. 382, 122 Pac. 394, the city under a like claim to the exercise of general and state police power as here, attempted to avoid a levy of tax under the state law, by reason of its powers under Art. XX. Speaking through Mr. Justice Bailey, the court quoted and approved the following from the Cassiday case:

"As matters now stand, there is nothing whatever in Article XX which gives to the people of the city and county of Denver power to legislate upon anything whatever, concerning matters solely of state and county governmental

import, except merely the designation of certain agents to perform therein the acts and duties incident thereto.

These excerpts from our own decisions serve to conclusively show that the people of the city and county of Denver have no power whatever to legislate in the slightest degree upon any matter solely affecting state and county affairs. Such has been the construction given Article XX, and none other was possible if the article was to stand."

And further, after quoting from the Sours case, the court said:

"It was this original construction of the purpose and intent of Article XX, to the effect that the people of the city and county of Denver had power to legislate upon and regulate matters of local concern only, that made it possible for the court to uphold and validate it, and this construction has ever since been rigidly and vigilantly upheld and maintained."

It was said by the court in *People v. Provost*, 55 Colo. 199, 134 Pac. 129, speaking through Mr. Justice Musser, and considering Art. XX and the Home Rule amendment:

"It has been determined again and again that the subject matter of Article XX was Home Rule, or the right of self-government by Denver and other municipalities in the state *relating to local and municipal matters*. Sec. 6 of the article, as it stood before the Home Rule Amendment gave to cities of the first and second class in this state the power to adopt charters and to govern themselves in *relation to their local and municipal matters*."

In the case of *Mauff v. People*, 52 Colo. 562, 123 Pac. 101, speaking through Mr. Justice Bailey, it was said:

"The distinction between the subject matter of this suit and the matters involved in *Denver v. Hallett*, 34 Colo. 393, and *Londoner v. City*, 119 Pac. (Colo.) 156, is that in the latter cases purely local matters were under consideration, while here the matter involved is one of public and general interest. That the people of the city and county of Denver

cannot legislate through their charter upon the latter subject is settled by all of our decisions."

And again: "Where the constitution and general laws of the state have not been, either by direct provision or necessary implication, set aside, they are as much in force in the city and county of Denver as they are in other portions of the state. The purpose of Article XX was to give to the people of the city and county of Denver exclusive control *in matters of local concern only.* * * * If by Article XX it has been undertaken to free the people of the city and county of Denver from the state constitution, from statute law, and from the authority of the General Assembly, respecting matters other than those purely of local concern, that article could not have been upheld."

And further:

"The contention is that the exclusive power having been given to the citizens of the city and county of Denver, by Article XX, to amend their charter, or to adopt a new charter, or to adopt any measure as therein provided, the power is with the people to provide for the conduct and control of elections as they may see fit. By every decision of this court, from the *Sours* case, *supra,* down to and including the case of *Hilts, et al. v. Markey, et al.,* decided February 21, 1912, which is the last expression upon this subject, it has been held that this *power extends to nothing except matters of local concern."*

It is contended that the *Hallett* case, 34 Colo. 394, 83 Pac. 1068, tends to support the contention of the city here, in the holding that it was the intention of Art. XX to confer upon the "people of Denver every power possessed by the legislature in the making of a charter for Denver." This falls far short of a decision that the people of the state, when they adopted the amendment invested Denver, or intended to invest it, with police powers which essentially belong to the people of the whole state.

The learned judge in that case could have had only in

mind the question of the grant of municipal powers only by the legislature.

The sole contention was that the building of an auditorium was not a municipal function within the meaning of Article XX. It was not suggested that the building of an auditorium for the city of Denver was a state function, or that the whole people of the state could have any possible interest in it. It was simply concluded that the city might construct an auditorium for the convenience, comfort and pleasure of the people of the city, as it is well recognized it may do in case of public parks and boulevards; in other words, that it was a municipal purpose.

This court has heretofore recognized that there might be provisions in the Denver charter in conflict with the constitutional amendment when it said: "It may be that the people of the city and county of Denver have, in some particulars, by their charter provisions, exceeded the grant of power given them, and if so, those matters are for correction in any proper proceedings to that end." *People v. Cassiday,* 50 Colo. 503, 117 Pac. 357.

11. It is important in this connection to consider the effect and importance of the provision contained in the amendment to Art. XX, providing for the application of general laws within the cities operating thereunder. The provision is as follows:

"The statutes of the State of Colorado, so far as applicable, shall continue to apply to such cities and towns, except in so far as superseded by the charters of such cities and towns or by ordinance passed pursuant to such charters."

This language can have but one meaning, fixed and definite—that all statutes of a general nature shall have application within municipalities. It is the precise converse of the language of the grant to municipalities—of powers limited to local and municipal matters.

There is perfect harmony between the language of the grant and the language of the reservation of power. The

sum of the two, equals the total of the state's inherent power, in this respect.

If we are accurate in our observation, no other constitutional grant of municipal charter powers, contains a similar, or any express reservation, hence in this instance, the language of the reservation must be considered in an interpretation of the grant. It would seem to be consonant with the spirit and purpose of Art. XX, which purpose we have so often declared was to give to such cities all powers of local and municipal concern only, to assume that all laws general in their character were intended to be included within the reservation above quoted.

If, however, it be contended that some general laws were to be included and others not, then how may we differentiate, between a statute plainly of a general character, and regulating public utilities, and one of the same character, otherwise involving the public peace, the public health, the public safety, or the public welfare generally.

In considering the many laws of this nature, can it be said that because some of the people of the state are domiciled in cities, that they are in any case freed from the common duties and obligations of citizens to the state, or that they are to be denied the equal protection of the laws.

By what rule is the court to determine which of these laws,- of the character we are considering, are to be included in, or excluded from, this provision of the article, making state statutes universally applicable. Will we not in all such controversies be compelled by necessity to rely upon the rule, that if the exercise of a general police power of the state has been conferred upon municipalities, it must so appear by specific and unmistakable declaration of the intent to do so, to be found in the grant itself.

12.   There is another all compelling reason why the contention of the city cannot be sustained. It is insisted that by the mere use of the term, "local and municipal" it was intended the inherent police power of the state claimed,

now rests within the municipality, and therefore the court should so construe it.

It is provided by Sec. 8 of the constitution, Art. XV, that:

"The right of eminent domain shall never be abridged nor so construed as to prevent the general assembly from taking the property and franchise of incorporated companies, and subjecting them to public use, the same as the property of individuals; and the police power of the state shall never be abridged or so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals or the general well-being of the state."

It cannot be said that this provision was repealed or in anywise affected by Art. XX including the amendment to Section 6 thereof. It is a bulwark too sacred to our liberties, to permit of such a contention.

"The police power of the state shall never be abridged." This seems in itself imperative and controlling, but the framers of the instrument were vigilant and they added "or so construed." Hence, both the legislature and the courts, were expressly prohibited from invading this reserved power, either by legislative act or by judicial construction.

The contention that each city operating under the amendment may regulate public utilities operating within its borders, must apply to all alike. It follows that if it applies to telephones, it likewise applies to railroads. In case of these utilities one company may operate in all municipalities and throughout the state.

It also follows that the one utility may be regulated by as many powers as there are cities of the specified class within the state, and by the commission as to all territory outside the cities. Each city may fix a different rate; the commission may fix a different rate from either city, for the same utility and for like service.

Can it be denied that such a scheme would not infringe

the equal rights of citizens of the state, or the well being of the state. It would not only permit the corporation to do this, but would compel them to do so, regardless of the necessary discrimination between citizens of the state as to rates to be charged and regulations to be observed. It would require the deficiency of income from one city to be supplied by overcharge in other cities, or by the body of the state, outside the cities; for the constitution as construed by the courts, guarantees the reasonable expense of operation, and a reasonable return on the investment in public utilities in the matter of fixing the rates to be charged. The logical result of such a plan, is confusion, chaos and injustice.

Construing a like provision of the constitution it was said by the Supreme Court of the state of Missouri:

"By the language of Sec. 8, Art. XV, the legislature is powerless to enact a valid law by the terms of which the right of the state in the exercise of its sovereign police power in the fixing of reasonable rates for public service, could be limited or abridged." *State, ex rel. City of Sedalia v. Public Service Com.*, 275 Mo. 201, 204 S. W. 497.

But while the legislature is thus powerless, it is not powerless to enact a valid general and uniform law asserting the police power of the state, in the particulars just mentioned, since there is not prohibition against this in the constitution. *Mauff v. People, supra.*

To adopt the contention of the city in this case would be to decide that the people of the state at large, by inference merely, there being no express grant, have abdicated every inherent police power of the state and surrendered it to home rule cities. It would not only be the announcement of a principle universally repudiated by all courts, but one, the tendency of which, would be to destroy our whole scheme of constitutional government.

My view of the matter is, that the people of the state have given to home rule cities, the right of local self government, with all the incidental powers, including full con-

trol and supervision of their local and municipal matters, but that the regulation of public utilities, not being a local or municipal matter, that power has been reserved by the state, and has been conferred exclusively upon the Public Utilities Commission.

In sum and in substance, the question here is; there is no language in Article XX, nor in the amendment thereto, that expresses the intent upon the part of the state to grant the compulsory rate making power of the state to the cities involved. We are asked to write such a grant of power into the constitution by construction; that is to say, we must interpret the term "local and municipal powers," to include and intend, "sovereign and general powers," as well. This I cannot do.

13. I recapitulate the points of law applicable to this case, each one abundantly supported by an undivided judicial opinion in this country, as follows: (1) The public utilities act does and was intended to confer exclusive jurisdiction upon the Utilities Commission for the regulation of all public utilities in this state including those operating in all cities; (2) In order to sustain the contention of the city we must hold the act void, insofar as it applies to all cities operating under Art. XX. of the constitution; (3) In order to do this we must find the act to be in conflict with that provision of the article of the constitution beyond a reasonable doubt; (4) The universal rule of law is that practical contemporaneous construction by the legislative branch of the government is to be given great weight in our consideration of the question involved; (5) It is a rule of law affirmed by all courts that the power of compulsory rate regulation is a sovereign and general police power, inherent in sovereignty, as distinguished from municipal powers resting solely on the express grant of sovereignty; (6) It is a rule of law affirmed by universal judicial opinion covering the whole period of government, that this sovereign power cannot be conferred except by language clear and unmistakable, and that such a grant

of power either to a municipality or otherwise, may never be inferred; (7) Repeated decisions of this court have declared in unmistakable language, that the powers conferred by Art. XX were limited to those of municipal concern only; (8) That therefore, by the express terms of Art. XX, and by the force of such decisions, any power assumed under the charter of the city, sovereign or general in its nature, as distinguished from a power local or municipal in character, is void as being in conflict with the grant, and for such reason was not and could not be ratified; (9) That the contention of the city is repugnant to a cardinal principle in constitutional government, in that its effect is to deny a republican form of government.

We know of no respectable judicial authority, state or federal, considering the precise question, which expresses a contrary view to any one of the foregoing principles of the law.

14. The issue here involves a great public question. It is solely between the people of the state on the one hand, and the people of the city on the other. No particular public utility is involved. No question of merit affecting the rights or interests of any one public utility, is to be or can be determined in this proceeding. The city has elected to renounce its right of review by the Supreme Court, of the merits of the cause, decided by the commission in the case of the utility, wherein and out of which this certified question arose, by declining to appeal from the decision against it.

No great public question should be permitted by the court to remain obscure in the public mind.

It is a law enacted by the constitutional law making power of the state we are considering. It is the public alone, both of the city and state, whose vital interests are directly affected, and this public has a right to understand the policy and principle of the law in question, in order that they may the better understand the construction which the court must place upon it.

Public utility regulation was the conception of the public mind. Its purpose was to curb and if possible, prevent injustice in the matter of public service, rendered by private interests, always loath to recognize the moral and legal rights of the community in such matters. All public regulation is therefore compulsory in character.

No court has yet ever held that such compulsory power rested in any subdivision of the state, except under specific grant by the state. But all courts have held on the contrary, that such power is inherent in sovereignty.

The history of rate regulation is replete with failures to accomplish the purpose. The earlier attempts to regulate, were by state statutes, and applied principally to railroads. These statutes fixed maximum rates to be charged. These were of necessity but the arbitrary declarations of the law making power. They were without hearing or determination as to merit or the rights of the private or public interests involved.

Therefore such rate regulation was universally held by the courts to be subject to consideration and determination by them as to whether or not, they were unreasonable or confiscatory in the particular instance. The federal courts thus assumed jurisdiction in such cases generally, and at least temporarily enjoined enforcement, in order to determine whether or not the rate so arbitrarily fixed was inhibited by that provision of the federal constitution which provides that no person shall be deprived of his life, liberty or property, without due process of law.

This practice became substantially universal, and the advocates of public regulation despaired of the accomplishment of their purpose. Finally there was evolved the plan, incorporated into the Texas railroad law; the Interstate Commerce Commission law, and into all railroad and public utility laws. This was by the creation of a commission, with delegated legislative powers to establish rates to be charged, and other regulations to be observed by public utilities, upon full hearing of the facts in each case, and

under the law controlling, with right of review by either party to the courts of last resort, either state or federal.

This seems to have overcome in a large degree the theretofore insurmountable objection to arbitrary regulation, by legislative acts.

That the sovereign state should create a duly empowered tribunal to hear and determine the merits of each controversy, and that such hearing and determination might be reviewed by the court of last resort in the state, was believed to satisfy the constitutional guarantee of due process of law. This now is the state of the Colorado law, and whether effective or not, it seems to represent at this time the best thought of economists, public spirited men, and legislative authority of the country on that subject. That this plan of public utility regulation has largely succeeded in the accomplishment of its purpose must be conceded. But that it has failed in many instances is equally apparent.

In the administration of this character of law, as in case of any other law, the Greek maxim, that no law is better or more efficient than those chosen to administer it, finds ample exemplification. It largely depends on the personnel of commissions, and of courts who administer and construe it, as to the degree of right and justice which is to obtain.

But if the contention of the city could be sustained under the law, and if the city by ordinance enacted by the city council, or by direct vote of the people, was to fix an arbitrary rate to be charged for service by any public utility, then clearly it would be subject to be enjoined in the federal courts, and the question of its reasonableness, or whether or not it is confiscatory, determined and finally determined, by such courts.

It will thus appear that to sustain the contention of the city, even though the law so permitted, would be as a matter of public policy, a step backward in the progress of rate regulation for thirty years.

This is illustrated by the case of *Denver Union Water Co. v. City and County of Denver,* U. S. Supreme Court, 246 U. S'. 178, 62 L. Ed. 649, 38 Sup. Ct. 278, where as late as 1915, the city adopted an ordinance fixing the rates to be charged by the Water Company, and which rates were held to be unreasonable and confiscatory, and were accordingly perpetually enjoined. Can the city expect any other procedure in any other attempted regulation by the enactment of an ordinance. And this was a case in which the franchise of the company had expired.

Can it be said that the people of the state, including the cities, without some sort of expression, either in the constitution or statutes, to that effect, intended or desired to return to that hopeless and helpless state in this regard. If so, it is within their power to write such an intent in plain language into their organic law. It is not within the province of a court to so write it for them.

Garrigues, C. J., and Mr. Justice Bailey concur in the dissenting opinion.

On application for rehearing, Bailey, J.:

While fully concurring in the dissenting opinion of Mr. Justice Scott, there are additional reasons why I cannot agree to the opinions of the majority, and why a rehearing should be allowed.

It has been urged by the respondents, especially by the Telephone Company, that section 280 of the Charter of the City and County of Denver is invalid because in conflict with the due process and equal protection clause of the Fourteenth Amendment to the Constitution of the United States, and that to construe Article XX of the State Constitution as amended so as to vest in the City and County of Denver the jurisdiction to regulate the business and rates of the respondent Telephone Company, thus depriving the Utilities Commission of that jurisdiction, is to bring the Article in question into conflict with the due process clause of the Fourteenth Amendment above mentioned.

These contentions seem, for the following reasons, to be well taken:

1. Section 280 of the Charter of the City and County of Denver reads as follows:

"All power to regulate the charges for services by public utility corporations, is hereby reserved to the people, to be exercised by them in the manner herein provided for initiating an ordinance." Municipal Code, 1917, City and County of Denver, page 146.

The manner of initiating an ordinance is prescribed by section 273 of said charter, which reads:

· "Any proposed ordinance may be submitted to the council by petition therefor of qualified electors equal in number to at least five per cent of the last preceding vote for mayor, and such proposed ordinance shall be passed without alteration by the council, and if vetoed by the mayor shall be passed over his veto, within thirty days after such petition is filed, or the council shall refer such proposed ordinance to the qualified electors at the next municipal election held not less than sixty days after such petition is filed. If such petition contain a request for a special election and is signed by qualified electors equal in number to at least fifteen per cent of the last preceding vote for mayor, the ordinance thereby proposed shall be passed by the council without amendment or change, and if vetoed by the mayor, shall be passed over his veto, within thirty days after such petition is filed, or the council shall refer such proposed ordinance to the qualified electors at a special election which shall be called within thirty days, and held not less than sixty, nor more than ninety days after such petition is filed, unless a general or special election is held within said period of time, in which case such proposed ordinance shall be submitted to ·a vote at such election. The council shall cause such proposed ordinance to be published in some daily newspaper of general circulation once each week until such election is held. No ordinance adopted by vote of the people shall be repealed or amended by the council. Any provision of the charter in conflict herewith is hereby repealed." Municipal Code 1917, City and County of Denver, page 142.

It is demonstration that the method of rate regulation thus prescribed precludes the possibility of any hearing as the basis of regulation.   No presumption may be indulged in favor of the initiated ordinance relied upon by petitioner, nor in favor of any other initiated ordinance enacted in pursuance of the section of the charter, because the court judicially knows that there could have been no hearing of, or consideration given to, the facts upon which rate regulation, to be valid, must always be based.   Moreover, the charter provides a method by which telephone users may apply for a change in rates, but affords no method by which the Telephone Company may make such application. These sections of the charter manifestly deny the Telephone Company due process of law and the equal protection of the law, in violation of the Fourteenth Amendment. The majority opinions, in denying the jurisdiction of the Utilities Commisson to regulate the rates of the respondent company, necessarily and inevitably enforce against the Telephone Company these invalid charter amendments.

2.   Article XX as amended is so construed by the majority opinions as to parcel out the Telephone Company, a state-wide utility, and its property, among as many independent cities as there are in the State of Colorado having a population of 2,000 inhabitants, with the power in each city to regulate the business and rates of the company within its own borders, but necessarily without relation to the effect of such regulation upon the general service in other parts of the State, and of course without relation to the effect of such regulation upon the entire business or property of the company within the State.

There is no support in our State Constitution for such construction, and such construction brings the Article into direct conflict with the due-process clause of the Constitution of the United States, and the enforcement of that construction, necessitated by the majority opinions, clearly denies to the Telephone Company due process of law.

The several opinions of the majority, so far as they relate to the particular matters herein discussed, although

they do not present the same line of reasoning, have precisely the same effect, because they permit the city to arbitrarily fix rates for the Telephone Company, without the possibility of a hearing, and so plainly deny to it due process of law.

From each of these opinions, therefore, I must dissent, as well for the reasons so clearly and fully discussed by Mr. Justice Scott, as for the additional ones hereby suggested and likewise from the ruling of the majority in denying a rehearing in the case.

I am authorized to state that Mr. Chief Justice Garrigues and Mr. Justice Scott concur in this dissent.

Decided January 14, A. D. 1919. Rehearing granted June 2nd, A. D. 1919.

Decided July 7, A. D. 1919. Rehearing denied October 6, A. D. 1919.