Wanamaker, J.,
dissenting. The question in this case involves an order of the Public Utilities Commission fixing telephone rates for the city of Cleveland. Error is prosecuted to the order of the commission, claiming that said order is unlawful and unreasonable.
The majority opinion holds the order lawful and reasonable.
I hold that it is unlawful and unreasonable, because it is unconstitutional. That is, I hold that the commission, notwithstanding the statute, is utterly without jurisdiction, under the Ohio Constitution, to fix a public utility rate for the people of any municipality.
I hold that telephone rates generally, within municipal corporations, are now and always were matters of local self-government, and that on matters of local self-government the legislature .never had any power and jurisdiction, save such power and jurisdiction as was expressly given it in the constitution, which mentions but one such power, and that the debt-limiting power.
I stand by the old landmarks as announced by Judges Thurman and Ranney of Ohio. It is re *351 freshing to return to some of their wholesome fundamental doctrines. In Cass v. Dillon, 2 Ohio St., 607, the last paragraph of the syllabus reads:
“The constitution did not create the municipalities of the state, nor does it attempt to enumerate their powers. It recognizes them as things already in being, with powers that will continue to exist, so far as they are consistent with the organic law, until modified or repealed.”
The opinion discusses this same doctrine and fortifies it by numerous illustrations. This decision was rendered in 1853, when the Constitution of 1851 was still fresh in the minds of the court. Twenty years thereafter, the supreme court of Michigan, in the case of People, on Relation of Bd. of Park Commrs. of Detroit, v. Common Council of Detroit, 28 Mich., 228, in a most able opinion by Judge Cooley, concurred in by Justice Campbell, announced this doctrine in the syllabus:
“As regards property rights, and matters of exclusively local concern, the state has no right to interfere and control by compulsory legislation the action of municipal corporations.
“The people of other parts of the state, through their representatives, have no more authority to dictate to the city of Detroit what fountain shall be erected at its expense for the use of its citizens, or at what cost it shall purchase, and how it shall improve and embellish a park and boulevard for the recreation and enjoyment of its citizens, than have the rest of the community to dictate to an individual what he shall eat, drink, or wear.”
*352 This case reaffirms the doctrine announced in People, on Relation of Le Roy, v. Hurlbut, 24 Mich., 44, which is to the same effect, that local self-government is distinguishable and apart from statewide government, and that the local self-government has no more right to interfere with statewide government than statewide government has a right to interfere with mere local self-government.
To the same general effect are decisions from the supreme court of Indiana, where it was held in State, ex rel. Jameson, v. Denny, Mayor, 118 Ind., 382:
“The right of the people to govern themselves, as to matters which are purely local, through the medium of local municipal governments and officers chosen by themselves, was not surrendered upon the adoption of the Constitution, but is still vested in them, and it can not be taken away by the Legislature.”
I stand for these old home-rule landmarks of local self-government. The Thurmans and Ranneys of Ohio, and the Cooleys and Campbells of Michigan, have become immortal in our jurisprudence, and I am frank to admit a partiality for their sound reasoning in preference to the perverted doctrines of more modern days, which put the municipalities under the wholesale guardianship of the general assemblies. This doctrine of guardianship of the municipality by the state general assembly finds an appropriate expression in Ravenna v. Pennsylvania Co., 45 Ohio St., 118, the syllabus of which reads as follows:
*353 “1. Municipal corporations, in their public capacity, possess such powers and such only, as are expressly granted by statute, and such as may be implied as essential to carry into effect those which are expressly granted.
“2. A municipal corporation has not the power, by ordinance, to compel a railroad company to maintain, at a street crossing within the corporate limits, a watchman, for the purpose of giving warning to passers-by of the approach of trains.”
What a gulf between the decisions of the old jurists, the old masters of democracy, and the doctrine announced in the Ravenna case, supra. The people became very weary of this guardianship by the political bosses and big business operating through the legislature, and so they resolved in 1912 to return, so far as constitutional grants could accomplish it, to the rightful constitutional exercise of the powers of local self-government, and therefore the sovereign people of Ohio, in delegate convention assembled, solemnly declared in Section 3, Article XVIII:
“Municipalities shall have authority to exercise all powers of local self-government * *
This language is absolute, plenary, complete, unlimited, so far as municipal power is concerned. And then follows this language, “and” — And what ? I have always understood that “and” means to add something, not to subtract. I have always understood that it means to include something that has not theretofore been included. All municipal power having been included, the language following *354 the first clause, “and” in Section 3, must be intended to add state power, because there is nothing else to add. Therefore they said when the municipality is exercising state power touching “local police, sanitary and other similar regulations,” it must conform to general state laws. If the language doesn’t mean that, then the last half of Section 3 is fully capable of absolutely destroying the first half, something that is unbelievable. The constitution-makers were not so ignorant and stupid in the use of simple English as to have done or intended to do any such vain thing.
But how big and broad is this phrase “all powers of local self-government,” which the municipalities are expressly authorized to exercise? Surely this circle of control over local self-government is big enough in diameter to include all those matters and affairs that are inherently, primarily and by customary usage local in their nature, character, and effect.
This court has recognized that the fixing of public utility rates is inherently a municipal matter, a power the exercise of which the general assembly in times past has conferred by statute upon the municipality. This recognition of statutory grant appears repeatedly in recent cases, among which are the following: Froelich v. City of Cleveland, 99 Ohio St., 376, and Ohio River Power Co. v. City of Steubenville, Id., 421.
By common consent the Constitution of California is recognized as more nearly approximating the new Ohio Constitution touching home rule for municipalities than any other state constitution, *355 though its granted powers are conceaedly more limited than those of the Ohio Constitution. Yet under the doctrine prevailing in California, the supreme court of that state has held that the fixing of telephone rates is a municipal affair.
If it is a municipal affair it would seem to the lay mind to be a matter of “local self-government.”
There are two federal cases very much in point, passed on by the supreme court of the United States, touching this matter of municipal power in municipal affairs under state'constitutional and statutory provisions even less favorable to home rule than is the Ohio provision.
In St. Louis v. Western Union Telegraph Co., 149 U. S., 465, the supreme court had before it the charter power of the city of St. Louis. Justice Brewer speaking for the court said, at page 467:
“Control over the streets resides somewhere. As the legislative power of a State is vested in the legislature, generally that body has the supreme control, and it delegates to municipal corporations such measure thereof as it deems best. The city of St. Louis occupies a unique position. It does not, like most cities, derive its powers by grant from the legislature, but it framed its ozvn charter under express authority from the people of the State, given in the constitution.”
Justice Brewer continues: “And this charter is an organic act, so defined in the constitution, and is to be construed as organic acts are construed. The city is in a very just sense an ‘imperium in imperio! Its powers are self-appointed, and the reserved *356 control existing in the general assembly does not take away this peculiar feature of its charter.”
In Home Telephone & Telegraph Co. v. City of Los Angeles, 211 U. S., 265, Mr. Justice Moody speaking for the court said, at page 271:
"The power to fix, subject to constitutional limits, the charges of such a business as the furnishing to the public of telephone service is among the powers of government, is legislative in its character, continuing in its nature, and capable of being invested in a municipal corporation.”
Another pertinent and illuminating case is a recent decision by the supreme court of Colorado, touching the charter of the city and county of Denver, reported in City and County of Denver v. Mountain States Telephone & Telegraph Co., (67 Colo., 225), 184 Pac. Rep., 604. The syllabus in that case, much in point, is as follows:
“5. The people of the state may regulate the business of public utilities through any agency created by them for such purpose, and are not required to do so through an agency created by the legislature.
"6. The police power is not above the Constitution, but is bounded by its provisions and may be exercised by any agency which the Constitution creates for that purpose.
"7. Under Const. Art. 20, the city and county of Denver has the power to regulate telephone rates to be charged for local service within its territorial limits; such regulation being a municipal function.
“8. The police power to regulate rates to be charged by public utilities may be invested in a *357 municipality without use of express language, it being sufficient if such power necessarily arises from or is fairly implied in, or is incidental to., the powers freely granted or is essential to the declared objects and purposes of the municipality.”
It is almost like arguing an axiom to say that regulating municipal rates for service rendered by any public utility to a municipality and its inhabitants is essentially and inherently a purely local matter, a municipal affair.
Lest, however, there should be any doubt of the grant of this power under the general home-rule grant expressed in Section 3, Article XVIII, the constitution went farther and expressly and explicitly provided for the exercise of certain powers by the municipality touching public utilities. This specific power is expressed in Section 4, Article XVIII, in this phrase, “may contract * * * for any such product or service” of any public utility for the benefit of the municipality and its inhabitants.
This power upon the part of the municipality had been denied by the supreme court of Ohio in Farmer v. Columbiana County Telephone Co., 72 Ohio St., 526, in the syllabus of which the following appears:
“They [municipal corporations] have not power to exact or receive compensation by way of. free telephone service for themselves or for citizens, or to fix rates for telephone charges.”
That was applied to the statutes then in existence.
The new constitution was not adopted until some seven years thereafter. It would seem as though this specific power in Section 4, Article XVIII, was *358 especially directed to meet this decision in the Farmer case, supra, as well as the disinclination of the legislature to expressly grant such power.
I hold that the express grant of power in Sections 4 and 5 of Article XVIII, the power to contract, is an exclusive grant of power. While there are no words expressly excluding other branches of the government, or other agencies of the government, from exercising this power, that follows as a matter of necessary implication from the former decisions of this court. That necessary implication arises from these elementary principles — what the sovereign people do by their constitution, their subordinate, the legislature, may not undo by statute, else the agent in government is more powerful than his principal. This prohibition extends not only to the whole of any constitutional provision, but to each and every fractional part thereof. When the sovereign people by their constitution have made an express grant of power, this court has necessarily held that such grant is not only exclusive by nature, but that in legal effect it is a denial to all other branches and divisions of the government of the right to in any wise interfere with such grant.
That express grants are exclusive grants, by authority of numerous decisions of the Ohio supreme court, will appear from the following:
In city of Zanesville v. Zanesville Telegraph & Telephone Co., 64 Ohio St., 67, the first paragraph of the syllabus reads:
“1. The distribution of the powers of the state, by the constitution, to the legislative, executive, and judicial departments, operates, by implication, as *359 an inhibition against the imposition upon either, of those powers which distinctively belong to one of the other departments.”
Simplified, this means that when a power is granted to the legislative department it is denied to the judicial and executive departments, and when any power is granted to either the judicial or executive it is inherently denied to the other departments of the state government.
This same doctrine was upheld by our supreme court in Village of Fairview v. Giffee, 73 Ohio St., 183, the first paragraph of the syllabus of which reads, in part:
“Under the constitution of this state the power of defining the functions of the judicial department is only limited by the general rule that a grant of general powers to any department constitutes of itself an implied exclusion of all other departments from the exercise of such powers * *
If this doctrine be sound as to a department of the state government, it is likewise sound as to any division of the state government. To apply one principle to a department and a different principle to a division would be to make a trifling technical distinction between two cases in which there was no basic difference, contrary to the uniform holding of practically all the courts. In the opinion in the Fairview case, supra, at page 187, Davis, C. J., quotes with approval-the following in the opinion of Judge White in State, ex rel., v. Harmon, 31 Ohio St., at page 258:
“The power of allotting to the different departments of government their appropriate functions is *360 a legislative power; and in so far as the distribution has not been made in the constitution, the power to make it is vested in the general assembly, as the depository of the legislative power of the state.”
It follows that where the “distribution” has been made “in the constitution” the legislative power of the state is not the depository for any different distribution.
The Fairview case was decided in 1905 and has never been reversed or overruled. Under the new Constitution of 1912 the same doctrine in principle is announced in Cincinnati Polyclinic v. Balch, 92 Ohio St., 415. Paragraph 1 of the syllabus reads:
“1. Section 6, Article IV of the Constitution of Ohio as amended September 3, 1912, confers jurisdiction upon the courts of appeals to review, affirm, modify or reverse the judgments of the court of common pleas, superior courts, and other courts of record within the district. The general assembly has no power to enlarge or limit the jurisdiction conferred by the constitution of the state, but may provide by law for the method of exercising that jurisdiction.”
The doctrine here announced in these last three lines is exactly the doctrine I invoke for application in the case at bar, the absence of “power to enlarge or limit the jurisdiction conferred by the constitution of the state.”
It matters not upon whom that jurisdiction is conferred, what agency may be the grantee, the same principle must be held to apply.
Again, this doctrine of jurisdiction applies equally to the doctrine of power, for they are *361 scarcely distinguishable. Jurisdiction without power, of course, is an empty word, and it is only potential where there is governmental power. The two words “jurisdiction” and “power” are often used interchangeably, the word “jurisdiction” being applicable more particularly to courts, therefore being judicial, while “power” more frequently refers to other governmental bodies and is more generally recognized in its broad nature as being political. The court soundly held that this jurisdiction or power was of necessity an exclusive grant, else it was meaningless. The legislature can neither add to nor subtract from it.
Surely it is not more essential to preserve the powers and jurisdiction of courts than to preserve the powers and jurisdiction of the people, not only over courts, but over all governmental bodies. Nor is it more necessary to invoke these doctrines to protect the grants of power to the courts than it is the grant of power to the people in matters of local self-government. They both have a common source, and this court is as much under obligation to safeguard the one as the general assembly is to safeguard the other. This doctrine was announced and approved in Wagner v. Armstrong, 93 Ohio St., 443, decided in 1916.
Later on this same doctrine was announced in Fulton v. Smith, 99 Ohio St., 230. It will be remembered that this- case involved the question of the right of the general assembly to add to the express terms and provisions of the section of the state constitution touching the disqualification of certain *362 judges, while in office, to be elected to any other “elective office under the authority of the state.” The constitution disqualified judges of the court of common pleas and supreme court and prohibited votes for such elective office. The statute went farther and undertook to also disqualify all other judges. Probate judges at the time the constitution was adopted were constitutional judges, and this court wisely held, and by a unanimous judgment, that the disqualification as to judges as put into the constitution was an exclusive exercise of power upon the part of the people, and that the legislature had no right to interfere with it by addition or subtraction, as to constitutional offices. The constitution had the last word upon the subject. In the opinion in the Fulton case, supra, it is said, at page 232:
“Under rules which are familiar and sanctioned by experience, it must be presumed that when the makers of the constitution took up and considered the subject and specified the two courts as to which the prohibition should apply they intended that as to the judges of other courts no such prohibition should be made.”
When this doctrine is applied to this grant of power, expressed in Section 3, Article XVIII, “all powers of local self-government,” and more especially when applied to Sections 4 and 5, Article XVIII, as to “power to contract,” its legal effect, when so applied, is to make this grant to the municipality of power to contract an exclusive grant of power.
*363 It may be said that these various cáses in no wise affect Article XVIII dealing with municipalities; yet the principle is the same.
But we have at least one case dealing directly with this question. In City of Elyria v. Vandemark, 100 Ohio St., 365, Section 1, Article XVIII, was under review, touching the right of the general assembly to classify cities. There was no express denial in the constitutional provision of the exercise of the right to classify municipalities, and the power of classification had been exercised prior to the Constitution of 1912 times without number. Ripper legislation indeed had been so common in the general assembly at the behest of political bosses and the big interests that it became exceedingly offensive to the people of the state generally, whether they were within or without the municipality. This court however held with the doctrine, in the second paragraph of the syllabus, as follows:
“2. The constitution of the state having classified municipalities on the basis of population, the legislature is without authority to make further classification thereof for the purpose of legislation affecting municipal government.”
Judge Matthias in his opinion in that case says, at page 371:
“It is to be observed that the constitutional convention not only did not confer any power whatever upon the legislature to make any classification of municipalities, but it denied the legislature such authority by retaining and exercising that jurisdiction itself. It thereby withheld that subject absolutely and entirely from legislative control and permitted *364 it to be no longer a matter of statutory jurisdiction. The general assembly has no power to enlarge or limit a jurisdiction specifically conferred by the constitution. (Cincinnati Polyclinic v. Balch, 92 Ohio St., 415.)”
It will be observed here that the words “jurisdiction” and “power” are used interchangeably, and it is clearly held that either under an express grant of jurisdiction or an express grant of power such grant is inherently and necessarily an exclusive grant. This power to classify municipalities was exercised by the sovereign people of the state through their constitution. In the Elyria case, supra, this court unanimously held that this power was an exclusive power, and a denial therefore to the legislature to in any wise interfere with it.
I invoke the same doctrine that this court has approved and unanimously admitted to be true as to Section 1, Article XVIII, for the protection of Sections 3, 4 and 5, Article XVIII.
One express power in Section 1 is exclusive. Another express power in Section 3 is not exclusive. Another express power in Sections 4 and 5 is not exclusive. How can any attorney at law, how can any client, know with any degree of certainty what the law is touching these constitutional provisions, when courts are drawing distinctions in syllable where there are no differences in substance ?
If a power exercised by the people in the constitution is exclusive, it cannot be any more exclusive than a power delegated by the sovereign people of the state to some agency of the state, within the fair and reasonable limitation of that grant.
*365 The power to contract includes the power to refuse to contract. It includes the power of selecting the party with whom you may wish to contract. It includes the right to fix the terms and conditions of that contract. Disregarding these rights, the telephone company took its cause to the public utilities commission, and the public utilities commission proceeded to “fix rates.” That is what they called it. In effect and operation they proceeded to make a contract. Worse than that, they proceeded to coerce the parties into accepting the contract. The order and judgment of the commission included all the elements of an obligatory contract and fixed all the necessary obligations, terms and conditions submitted, within the statutory jurisdiction of the commission.
I maintain that this is a direct violation of Sections 3, 4 and 5, Article XVIII, especially Sections 4 and 5 dealing with the power to contract. If it be not a direct violation of Sections 4 and 5 it is to all intents and purposes an indirect violation. The old axiom that what one may not do directly he may not do indirectly applies equally to the government and the agencies of government. It is wholly unnecessary to support this axiom by argument or adjudicated cases.
Let us apply another test to this invading and overturning of the constitutional grant of power to municipalities by the present interpretation of the supreme court of the public utilities statute, by which interpretation the municipality is deprived of the constitutional power “to contract” for the product and service of the utility.
*366 Suppose the legislature were to pass a law especially creating a commission, under whatever name, charged with the duty under such statute of making contracts between public utilities and the municipalities, touching all public utility service within the municipalities.
Under the adjudicated cases herein cited, and the fundamental principles upon which they are based, would anyone seriously contend that such a statute would be constitutional? Would anyone seriously contend that all these adjudications cited would not hold that that power, being granted and expressly delegated by the sovereign people of the state to the sovereign people of the city, was an exclusive grant of power, with which the legislature or its created commission had absolutely no right to directly interfere?
Now, if the legislature may not directly create such a commission to exercise that “power to contract,” when it is so expressed and labeled, will anyone contend that it may do insidiously or indirectly those very things, under the name or guise of “fixing rates ?”
Does not this very policy absolutely destroy the city’s right and power to make a contract of advantage to the municipality and its inhabitants? Undoubtedly so.
The constitutional grant of power to contract is limited in two ways in Sections 4 and 5, Article XVIII:
1. That power to contract shall be exercised by ordinance.
*367 2. The people shall havé the right of referendum on that ordinance.
Obviously the constitutional convention not only intended that this should be a purely local matter, but that it should be done deliberately and openly, by the people’s chosen legislative servants in their council chamber, with the usual readings and debates and publicity; and that after such ordinance had conformed to the customary legal steps, then the people, if they were dissatisfied therewith, might demand a referendum upon the same within thirty days, and by such referendum might defeat the ordinance fixing the rate if they believed the same to be unfair, excessive, or in any wise unjust as to its terms and conditions.
The people’s right to the referendum in legislative affairs was so plainly and potentially written into the Constitution of Ohio in 1912 that there should be no mistake about it, — no quibbling about it. It is expressly and explicitly dealt with in Article II, Sections lb, 1 c, et seq. By Section If, Article II, it is expressly provided:
“The initiative and referendum powers are hereby reserved to the people of each municipality on all questions which such municipalities may now or hereafter be authorised by lazv to control by legislative action; such powers shall be exercised in the manner now or hereafter provided by law.”
Will it .be claimed that the language “authorized by law” is not broad enough to include Sections 4 and S, of Article XVIII, adopted by the same convention and approved by the people at the same election?
*368 The power to contract had to be exercised by “legislative action/’ and the people had the right, after their representatives in council had taken such “legislative action,” to exercise the right of referendum thereon.
In the attempt of the legislature to delegate to a state commission the right and power which the sovereign people had delegated directly in their constitution to the municipalities, we have the clearest and most vicious invasion of constitutional right and principle. It brings to my mind the doctrine approved by Judge Ranney in Cincinnati, Wilmington & Zanesville Rd. Co. v. Commissioners of Clinton County, 1 Ohio St., 77, in which he says at page 86:
“And we agree, entirely, with the' supreme court of Pennsylvania in Parker v. Commonwealth, 6 Barr, 511, that ‘it is this species of insidious infraction that is more to be feared and guarded against, than direct attacks upon any particular principle proclaimed as a part of the primordial law: for attempts of the latter description will, generally, be met by instant reprobation, while the stealthy and frequently seductive character of the former is apt to escape detection, until the innovation is made manifest by the infliction of some startling wrong/ ”
That this power exercised by the commission in this case and similar cases is a clear violation of the people’s rights in local self-government — the people’s particular right of referendum upon the legislative action of their officials — there can be no reasonable doubt.
*369 Nearly a century and a half ago America was born in the protest against taxation without representation. To-day there is not only taxation without representation, so far as the public utility commission is concerned in this case, but also without constitutional right of referendum. Then it affected only three million people in the thirteen British colonies, to an amount of less than a million dollars annually paid to the mother country for the support of their government. To-day it affects more than three million people in the municipalities of Ohio alone, and as a precedent for many millions more, in a sum not of millions of dollars charged against the people, but of billions of dollars. Then it was an unwritten right predicated upon an unwritten constitution unmade by the sovereign people. To-day the right is predicated upon a written constitution, expressly and solemnly made by the sovereign people of Ohio. Then it took seven years of battle to win a victory. To-day, how many years of ballots will it require to win this victory ?
The ruling of this court which destroys most effectually the people’s right of referendum may soon be extended to other commissions, — a commission, for instance, of public peace, of public welfare, and the like, — all in the name of the police power, — when we will have a perfect autocracy at Columbus, governing the municipalities of the state, and absolutely denying to them anything, not even a share of home rule or local self-government.
We have fought a world’s war for democracy abroad. Is it not about time that we began to fight *370 for democracy at no me, especially for democracy in our community life, where democracy had its birth and its beginning?
An examination of the court’s opinion in this case clearly shows that the constitutional question is studiously avoided, save and except that which appears as a closed issue in a reference at the beginning of the opinion to Cleveland Telephone Co. v. City of Cleveland, 98 Ohio St., 358. This is merely' a reference to the old doctrine “thus saith the court.” It is the doctrine of stare decisis carried to the nth degree. I suggest an improvement of that doctrine by substituting therefor the doctrine of stare principiis. The latter doctrine obligates me as a judge to stand by the generally acknowledged sound principles of law. But I am in no wise bound to stand by an unsound decision of the court, especially when based upon such glaring fallacy as in the Cleveland Telephone case, above referred to.
The premise upon which that judgment is based is shown by the opinion, in these words, at page 362:
“Police power, however, cannot be divided along these lines or any other lines. There is no such thing as municipal police power as distinguished from state police power. Such a proposition is too absurd to require argument to the contrary.”
From the earliest days when America became a nation, every student of American government, in the freshman year, was brought face to face with the self-evident proposition that police power was divided between the state and the nation, and in the state divided between the state and the political sub *371 divisions thereof by the constitution itself. The only time that police power is undivided is when it resides in the breasts of the people, where all political power is inherent. It is for the sovereign people to say to whom they will delegate it, and as to how much they will delegate. I close this phase of this case with a quotation from the opinion of Judge Thurman, in Cass v. Dillon, 2 Ohio St., page 616:
“That the powers of the subdivisions, as well as of the state herself, are derived from the constitution, is undoubtedly true. But equally true is it that it was competent for the people to confer upon the one, powers not conferred upon the other; and there is nothing in the least degree irrational, in supposing a grant of power to a subdivision, that is withheld from the state at large.”