Wanamaker, J.,
dissenting. I dissent both from the judgment and the reasons assigned therefor by the majority of this court.
I hold that in 1919, when the ordinance in question was passed, the city of Ironton had full home-rule or municipal powers to pass the ordinance in question, especially under the franchise-contract between *184 the gas company and its predecessors in' title, on the one side, and the city of Ironton, on the other, entered into in December, 1897, for a period of 25 years.
All must be agreed that under the American system of a written constitution, the provisions_of that written constitution constitute the primary and paramount law of the people and their official servants in each and every branch of the government — division, or political subdivision, of the state.
It has become the settled law of both our national and state jurisprudence that in proper cases it devolves upon the court not only to support national and state constitutions, but also to duly limit and restrain all governmental agencies within the powers delegated in those constitutions and the limitations thereon.
The people of Ohio, being dissatisfied with the old Constitution of 1851, by reason of the mischiefs that had arisen thereunder, undertook in 1912 to largely amend that constitution, and among other amendments proposed and adopted was the 18th Amendment, dealing solely with municipal corporations.
So eager was the demand for municipal reform upon the part of the people of the various municipalities, which was evidently concurred in by the constitutional convention, that the latter provided that Article XVIII, dealing exclusively with municipal corporations, should be one of the first of the new amendments to go into effect, as follows:
“Schedule. If the foregoing amendment to the constitution be adopted by the electors and become a part of the constitution, it shall take effect on November 15, 1912.”
*185 The most vital section in above Article XVIII is concededly Section 3, which reads as follows:
Part 1. “Municipalities shall have authority to exercise all powers of local self-government.”
Part 2. “And to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.”
Concededly if part 1 stood alone it would be trifling to contend that “all powers of local self-government” did not include the power to pass a gas franchise and fix rates for the public and private service thereunder.
But it is claimed that by virtue of the language in part 2 the powers mentioned in part 1 are entirely subject to such limitations as the state or general assembly may impose from time to time in the exercise of its police power.
It should be observed that part 1 deals wholly with municipal affairs, “local self-government.” It includes nothing less and nothing else, and it includes “all powers of local self-government.” Hence it follows that so far as local self-government in municipal affairs was concerned there were no further powers to be granted by the sovereign people of Ohio or their agents to the sovereign people of municipalities.
Now as to part 2 it should be noted that that part is introduced by the conjunction and, and in the plain phrase and purpose of the people cmd means “more, not less.” It means addition, not subtraction. It implies in this connection additional power, not limitations on previous grants of power. All municipal powers having been granted in part 1, the grant in part 2 must have applied only to state pow *186 ers, as to which it was provided that the exercise of such state power should not he in “conflict” with the general laws of the state. This was a sane and sound provision.
It should also be noted that in part 1 you have the general word “powers,” while in part 2 you have only the specific words “police regulations,” well known in the law of Ohio, words long used in our Revised Statutes and General Code as a title, and which are there today, third volume Page and Adams Annotated Ohio General Code, page 209, where “Police Regulations,” relating to criminal and quasi-criminal laws, appear as part of the Ohio statutes, classified and scheduled. No doubt the constitutional convention had that before it at the time of the drafting of this provision.
That part 2 is not an extension of part 1, and not a limitation of it, appears not only from the language of the text, but from the constitutional debates. Two of the strongest men of that convention were Judge Hiram D. Peck of Cincinnati, who had charge of the judicial amendment, and Prof. Knight of Ohio State University, who had charge of the municipal corporations amendment. The following appears in an open debate in that convention, as found in volume 2, on page 1451 of the debates:
“Me. Peck : I want to get back to this question as to general government and local self-government. In section 7 you say that ‘any city or village may frame, adopt or amend a charter for its government, and may exercise thereunder all powers of local self-govemment.’ What powers do you mean?”
“Me. Knight: All powers of local self-govern *187 ment, subject to the limitations of section 12 [now section 13].
“Mr. Peck : Point it out.
“Mr. Knight: Section 12 [now section 13]: The general assembly shall have authority to limit the power of municipalities to levy taxes and incur debts for local purposes.” Volume 2, Constitutional Debates of 1912, 1451.
Here is confirmation as strong as holy writ that the limitation upon “all power of local self-government” was Section 13, and no other section, and there was no dissenting voice in that convention to that proposition. Manifestly, the convention had some right to declare its own definition, to manifest its own meaning as to its own language in the drafting of the proposal — the more so when that meaning is thoroughly consistent with the language used.
But, again, that convention, when it submitted the proposal to the sovereign people of the state for their consideration, adoption or rejection, issued an address to the voters that was put at the head of the several amendments. That portion of the address to the voters of Ohio, at the head of the 18th Amendment, dealing with municipal corporations, was as follows:
“Cities and villages under the proposed amendment are given the right to frame their own charters, own cmd regulate their own public utilities, and to adopt by ordinances such regulations, not in conflict with general laws, as they may deem necessary. To the general assembly is specifically reserved the authority to limit the power of cities to levy taxes and incur debts for local purposes, to control elec *188 tions, to examine into the financial condition and transactions of all municipalities, and, by general laws, to make such provisions for education, police and sanitary regulations and other similar matters, as may be for the general welfare of the state.” (Volume 2, Constitutional Debates, 2052.)
Not the general welfare of the city, but of the whole state. In short, part 1 provided for the immunity of the municipality from general laws in its strictly municipal affairs, except as provided in Section 13.
Part 2 provided for the preservation of the uniformity of law throughout the state in state affairs, that is, where the general welfare of the state was involved. That construction is not only consistent with but absolutely necessary to give reasonable force and effect to each and every part of Section 3.
Such powers as are dealt with here are recognized as municipal affairs, affairs that are local, and do not concern the state at large. If there be not democracy as to these community matters, then it is absurd to talk about democracy in state and national matters.
I hold, therefore, that in 1919, when this ordinance in question was passed, the people of the city of Ironton had the undoubteded right to “regulate their own public utilities.” I concede, however, that regulation must not amount to a confiscation, which will be discussed later.
In the parent home-rule case, State, ex rel. City of Toledo, v. Lynch, Aud., 88 Ohio St., 71, the opinion by Judge Shauck, O. J., is illuminating. It was delivered within six months after the time the home-rule amendment went into effect. On page 97 of the *189 opinion is a definition of the powers conferred under the phrase “all powers of local self-government:”
“They are such powers of government as, in view of their nature and the field of their operation, are local and municipal in character. The force of the terms employed requires the inclusion of such powers to be exercised by officials who in some manner and to some extent represent the sovereignty of the people.”
Any question here about the local nature of fixing gas rates for Ironton? Any question here about “such powers to be exercised by officials who are in some degree and to some extent representing the sovereignty of the people?”
Does an appointive state commission at Columbus better represent the sovereignty of the people of Ironton than the people of Ironton themselves?
That this express grant to the municipality is exclusive to the municipality and impliedly denies to the state legislature or its political agencies any right to interfere with this municipal power has been so often declared in principle by this court that it would seem unnecessary to discuss this phase of the case. Yet, while we so often agree on an abstract principle, we disagree on the application of that principle to the basic facts of a case.
One of the earliest announcements of this principle of the expression of one power being the exclusion of another, or the expression of one grant of power to one division of a state or branch of the government being an implied denial of that same grant to any other division or branch of the government, was laid down by the old jurist, Judge Thur *190 man, in his own inimitable simplicity and strength, in Cass v. Dillon, 2 Ohio St., 607, at page 616:
“That the powers of the sub-divisions, as well as of the state herself, are derived from the constitution, is undoubtedly true. But equally true is it that it was competent for the people to confer upon the one, powers not conferred upon the other; and there is nothing in the least degree irrational, in supposing a grant of power to the sub-division, that is withheld from the state at large.”
That is exactly what was done in the 18th Amendment. All powers expressly granted to the municipality were exclusively granted to that municipality; that is, by the clearest implication they were equally denied to the state at large, or any commission, public utility or otherwise, created by the general assembly.
We have applied this doctrine to protection of the jurisdiction or powers of our courts, the court of appeals and supreme court, holding that the constitution having fixed our jurisdiction, that is, our powers, the general assembly can neither add to nor subtract from or in any wise modify them, and that the statutes purporting so to do were unconstitutional and therefore null and void. We were substantially unanimous on this proposition, and this doctrine has been followed touching these courts, the judicial branch of the government, again and again, and is no longer open to controversy. Cincinnati Polyclinic v. Balch, 92 Ohio St., 415, and Wagner v. Armstrong, 93 Ohio St., 443.
Why should we not show equal zeal for safeguarding the jurisdiction and powers of the municipalities under a like express constitutional grant? *191 If a constitution is an exclusive grant of power to a court, why is it not in principle equally an exclusive grant of power to a municipality?
Now the public utilities act was passed in 1911. It was in effect when the constitution was adopted, and when the home-rule amendment went into effect November 15, 1912. So far, however, as it was inconsistent with the constitution in the exercise by a state authority, a state commission, the public utilities commission, of power which under the constitution was now granted to the municipalities, such statute must fall, and the schedule to the constitution so provided. That question was up in the Lynch case, supra. Judge Shauck, again, in his opinion, at page 92, uses this language:
“It follows .that all laws in force when the latter took effect, and which were not inconsistent with it, would have remained in force without an express provision to that effect: and all inconsistent laws fall simply because they were inconsistent; in other words, all repugnant laws were repealed by implication.”
So the public utilities statutes, so far as they undertook to give to that commission jurisdiction within municipalities, became inoperative in the cities after November 15,1912, when the home-rule amendment, Article XVTII, went into effect, so far as rate-fixing, which is a purely local self-governing feature of public affairs, is concerned.
The supreme court of the United States has in two distinct cases clearly recognized the nature of local self-government, including the fixing of public utility rates under municipal charters.
*192 In a home-rule case, City of St. Louis v. W. U. Telegraph Co., 149 U. S., 465, Justice Brewer, speaking for the court, says at page 4167:
“The City of St. Louis occupies a unique position. It does not, like most cities, derive its powers by grant from the legislature, but it framed its own charter under express authority from the people of the State, given in the constitution. * * # And this charter is an organic act, so defined in the constitution, and is to be construed as organic acts are construed. The city is in a very just sense an ‘imperium in imperio.’ Its powers are self appointed, and the reserve control existing in the general assembly does not take away this peculiar feature of its charter.”
Under the Missouri constitution it was expressly provided that upon the adoption of the charter, home-rule might be exercised. There is no such provision preliminary to the exercise of home-rule powers in the Ohio constitution, and, while it has been held in the Lynch case that general municipal powers must be taken advantage of only through a charter, there is no holding to the effect that Sections 5, '6, 7 et seq., dealing with public utilities, are in any wise dependent upon such charter.
The other case, more recent, is the Los Angeles case, dealing with telephone rates, as reported in Home Telephone & Telegraph Co. v. City of Los Angeles, 211 U. S., 265. Mr. Justice Moody, speaking for the court, says at page 271:
“The power to fix, subject to constitutional limits, the charges of such a business as the furnishing to the public of telephone service is among the powers of government, is legislative in its character, con- *193 tinning in its nature, and capable of being vested in a municipal corporation.”
In addition to these two home-rule cases decided by the United States supreme court, a much later case was decided by the supreme court of Colorado, City and County of Denver v. Mountain States Telephone & Telegraph Co., 184 Pac. Rep., 604 (67 Colo., 226). In the syllabus, the following appears:
“7. Under Const, art. 20, the city and county of Denver has the power to regulate telephone rates to be charged for local service within its territorial limits; such regulation being a municipal function.”
I am entirely aware that our court held otherwise in the Cleveland Telephone case, 98 Ohio St., 358. That decision was based on such a self-evident and elementary fallacy that it cannot be supported either in law or logic. I have challenged this court and the members thereof again' and again upon this proposition, and have demanded that the error be corrected or some sounder proposition of law be announced to sustain the judgment. That fallacy is found at page 362, in these words, which are the foundation of the majority opinion in general:
“Police power, however, cannot be divided along these lines or any other lines. There is no such thing as municipal police power as distinguished from state police power. Such a proposition is too absurd to require argument to the contrary.”
In America police power has always been divided between nation, state, and local communities, as the sovereign people have from time to time delegated it. That you cannot delegate police power without dividing it is axiomatic. Let us return to the doctrine announced by Judge Thurman in the Cass case, *194 supra. That doctrine is not true merely because Judge Thurman announced it, but Judge Thurman evidently announced it because it was so obviously true.
In this case, the parties entered into a contract in 1897 for the use and occupation of the streets and public places of Ironton, for the purpose of furnishing gas to the city of Ironton and its inhabitants for the period of 25 years. The ordinance contained a large number of provisions unnecessary to here particularize, but one of the most important provisions of such franchise-contract was the following:
“That said Otto Germer, Jr., and Joseph P. O’Brien, their associates or assigns [The United Fuel Gas Company, assignee] as a condition of the exercise of the privileges and grants herein contained, or any of them, shall furnish for public or private use, to said city and its inhabitants, such natural gas or other substance for the purposes aforesaid at any rate not exceeding twenty-seven and one-half (27%) cents per one thousand (1,000) cubic feet, with two and one-half (2%) cents per one thousand (1,000) cubic feet reduction- for prompt payment monthly within ten (10) days after notice to consumer, provided.”
The ordinance was duly published and accepted by the parties thereto, and they entered upon the performance of their duties and operated thereunder for a period of 22 years, when the controversy in this case arose.
Now, the parties having fixed by their franchise-contract a maximum price “not exceeding 27% cents,” so long as the ordinance of the city ,of Iron-ton does not differ from that maximum rate the gas *195 company cannot be heard to complain upon the ground of confiscation; it having expressly agreed to such provision and limitation in the franchise-contract.
That same question in substance was involved in the Columbus Street Railway franchise case, which went through the supreme court of the United States, Columbus Railway, Power & Light Co. v. City of Columbus, as found in 17 Ohio Law Reporter, 49. There, also, the plea of confiscation was made.
The doctrine therein announced is in substance that to require a company to abide by its franchise agreement, notwithstanding it will involve serious loss, is not the taking of its property without due process of law.
The opinion of the court, by Mr. Justice Day, dealt at length with this doctrine, and deified the Railway Power & Light Company the relief sought under the claim of confiscation.
That brings us to the question whether or not the franchise-contract of 1897 was a valid contract between the original parties and their successors and assigns.
The original case, reported in 103 Ohio St., 168, United Fuel Gas Co. v. Public Utilities Commission, likewise approves and affirms the validity of that franchise-contract. The report in that case is “By the Court,” and the position of the judges appears from the report as follows: Johnson, Hough, Robinson and Matthias, JJ., concur; Wanamaker, J., concurs in the judgment; Marshall, C. J., took no part iu the consideration or decision of the case. There is no dissent.
*196 In that per curiam opinion it is said, touching Section 5 of the ordinance, which is the one particularly in question, and now held to be in violation of Section 3982, General Code et seq.:
‘‘ Concerning the provision in Section 5, above referred to, it will be observed that it does not fix a definite rate or purport to fix any time during which the rate should be operative. If the franchise-contract had attempted to make a rate-contract covering a period of twenty-five years, it would have been invalid, because under the law then in force the city had no power to make a rate-contract for a longer-period than ten years.
“Where an instrument is open to two constructions, one of which will establish its validity and the other will render it invalid, that construction will be adopted, if the language will permit, which validates the instrument. ■
“By the provisions of Section 2478, Revised Statutes, which was then in force, the council had power ‘to regulate, from time to time, the price’ which such company might charge. Inasmuch as Section 5 does not purport to fix any definite period for which the rate should be effective, council was free at any time to further regulate under the section referred to, and, by the provisions of Section 2479, Revised Statutes, the council was empowered to pass the rate-ordinance which it passed in 1909, establishing a rate for ten years, and, on the written acceptance of that ordinance by the company, under that section ‘It shall not be lawful for the council to require such company to furnish gas at a less price during the period of time agreed on, not exceeding ten years, as aforesaid.’ * * *
*197 ‘‘ On the expiration of that ten year period in 1919, the city had the right under the provisions of Section 2478, which was in effect at the time of the malting of the franchise-contract, to regulate the price for the three years that remained under the original franchise-contract, and the refusal of the company to accept the three-year rate-ordinance did not nullify that power of the city.”
The public utilities commission having refused to take jurisdiction of this question, this court upon review thereof affirmed the order of the commission, which appears at the close of the opinion: “The order of the commission will be affirmed.”
That doctrine is now reversed, and exactly the contrary doctrine is held, upon the ground that the franchise-contract is illegal and invalid by reason of being in violation of the ten-year period provided in Sections 3982 and 3983, General Code.
What the court found a clearly legal contract on July 5,1921, it now finds to be clearly illegal, though the company meanwhile has occupied the streets and public places of the city, has exercised any and all rights under the contract, enjoyed it to the full, and Received all the benefits, but now insists that it shall not bear the burden of the limitation of a maximum rate because the entire contract term exceeds ten years, and therefore is, it claims, invalid.
Now, if that franchise-contract is invalid as to one .party, it is invalid as to both. If the maximum of 27% cents is not a limitation upon the gas company, then the gas company has no franchise in the streets and public ways of Ironton, and has no right to file a schedule of rates upon the assumption that it has *198 a franchise, while in fact claiming the franchise contract to be invalid.
The gas company as well as the city has placed its own interpretation upon this contract, agreeable to law, and at no time has it undertaken to fix the gas rate for a period in excess of the ten-year limitation of the statute. That construction joined in by both parties to the contract for twenty-two years without objection should be held obligatory ■ upon both parties for the remainder of the three-year contract-term.
It is idle to complain at this time that the ten-year limitation was exceeded in the contract, because perchance the contract was for twenty-five years. The rate to be charged thereunder was not for twenty-five years, but was merely the maximum beyond which the company could not go. The ten-year limitation is in no wise involved in the three remaining years of the franchise-contract, and that provision of the statute has never been violated in the interpretation of that franchise-contract, and neither is it sought to violate it now.
But, suppose it were possible to violate it now.
The power to contract for service and product of a public utility corporation is by Article XVIII of the Ohio Constitution, Sections 5, 6 and 7, absolutely given to the municipality, without limitation.
A contract made in 1919, or at any date after November 15, 1912, for any period of time — not merely ten years, but twenty years, or fifty years — would be a valid contract under the home-rule provisions of Article XVIII. The grant of power to contract is unlimited and absolute in the constitution, and cannot thereafter be in any wise limited by statute.
*199 I cannot reconcile myself to the doctrine of overruling either City of Cincinnati v. Public Utilities Commission, 98 Ohio St., 320, that was decided in favor of the city of Cincinnati and its inhabitants, or the former decision of this court in the instant case rendered in the interests of the city of Ironton and its inhabitants.
It is conceded on all hands that Section 3, Article XVIII of the Constitution, “Municipalities shall have authority to exercise all powers of local self-government,” etc., constitutes a general grant. One of the sections of the article, however, Section 4, constitutes a specific grant, and so far as pertinent reads:
“Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants and may contract with others for any such product or service.”
For the first time this express and specific power of contract is given by the sovereign people of the state to the sovereign people of the municipalities in matters of “local self-government.” This power to “contract” with others for any such product is sole and exclusive to the municipality.
It would be absurd to say that this express grant by the sovereign people to the grantee, the municipality, specifically made, is consistent with another grant made not by the sovereign people of the state to their subordinates, their servants, their general assembly, under not the constitution, but a statute, by which the public utilities commission of the state undertakes to “contract with others for any such *200 product or service,” for and in behalf of the municipality, and against its will and over its protest.
Now the right to contract presumes the companion right to refuse to contract, and the constitutional right to refuse to contract is clearly nullified if the general assembly may grant a statutory right to contract to some board or commission.
The constitutional provision is clearly in conflict with the statutory provision, and if the doctrine of the decisions from time immemorial is to be followed, then, in case of such clear conflict, which must fall, the statute or the constitution?
Obviously, any statute enacted prior to 1912, the date of the adoption of the new constitution, the date of the new constitutional grant to the municipalities, inconsistent with the new constitution, is repealed by the adoption of the constitutional amendment. Upon this primary principle of legal construction and constitutional construction, we have protected the power of this court, that is the jurisdiction of this court, against all legislative invasion, modification, or interference. Cincinnati Polyclinic v. Balch, 92 Ohio St., 415 and Wagner v. Armstrong, 93 Ohio St., 443, are the earlier cases, and many more to the same general effect appear in the reports.
What the constitution provides for, a statute may not provide against; or, when the constitution enters a certain field and legislates in that field, that legislation may not be added to or subtracted from, or in any wise qualified by, the general assembly. This doctrine was unanimously decided in City of Elyria v. Vandemark, 100 Ohio St., 365, part of the syllabus in which case reads:
*201 “The constitution of the state having classified municipalities on a basis of population, the legislature is without authority to make further classification thereof for the purpose of legislation affecting municipal government.”
In this Elyria case the court holds that a statute purporting to further classify municipalities is void because in conflict with the constitution.
This same doctrine was announced in the case of Fulton v. Smith, 99 Ohio St., 230, where the court unanimously held:
“Under rules which are familiar and sanctioned by experience, it must be presumed that when the makers of the constitution took up and considered the subject and specified the two courts as to which the prohibition should apply they intended that as to the judges of other courts no such prohibition should be made.”
That is, the expression or enumeration of one or two of several things belonging to a class clearly implies the exclusion of all other things comprehended in that class. So, in the case at bar, when this grant of power to “contract” for the product or service of public utilities was expressly given to municipalities, it was likewise a clear exclusion of that same grant of power to every other political agency, especially state agencies.
There is no escape from this legal logic under all the decisions of our courts announcing and applying this principle. Let a further test be made of the exclusiveness of this grant to the municipality, that is this grant to contract “for any such product or service” of a public utility. Suppose in this same public utility statute of 1911, there was a delega *202 tion of power to the public utilities commission to make a contract for the municipality and the public utility in question, that is, suppose some section of that law provided in substance that “the public utilities commission might make a contract for any such product or service between the municipalities of this state and any public utility furnishing or seeking to furnish any such product or service,” would not tbe constitutional grant of 1912, “to contract with any person or company” for any such product or service, in and of itself, as a constitutional amendment, repeal the former statute of 1911, and leave the sole power to contract for any such product or service in the municipality1? Clearly the constitutional grant to the municipality would repeal the statutory grant to the public utilities commission.
Now the provisions and language of the act of 1911 do not strictly in terms authorize the public utilities commission to “contract with others for any such product or service,” but it does authorize it to fix a reasonable rate, as to which reasonable rate both parties are bound in law, so that it becomes a legal obligation upon them, implied of law, or created by law.
Now, what a statute cannot accomplish directly, in express terms, because in conflict with a constitutional grant of power, it cannot accomplish impliedly, indirectly, by implication. No claim is made that the statute of 1911 is unconstitutional, but it must follow from the foregoing that so far as municipalities are concerned the power of the public utilities commission to contract for rates, or to fix rates of public utilities within the municipal corporation, *203 ceased to have virtue or effect after the adoption of the constitutional amendment of 1912.